COMMONWEALTH *vs.* JOHN F. CURRIE.

Worcester. December 6, 1982. — April 15, 1983.

Present: HENNESSEY, C.J., ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Evidence,* Admissions and confessions, Hearsay. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Waiver. Homicide. Robbery. Felony-Murder Rule.*

Where a defendant in police custody made statements after being advised of his constitutional rights a number of times, and where the defendant continued with his statement to a police officer even though he was aware, as a result of telephone advice from an attorney, that he had the right to await arrival of counsel, a finding that the defendant had waived his constitutional rights was warranted despite delay by police in permitting the defendant to speak to counsel and despite questioning of the defendant after counsel had told police by telephone to stop further questioning. [778-784]

A judge's charge on the felony-murder rule was not made insufficient by his failure to instruct the jury that they must find conscious disregard of risk to human life in the underlying felony in order to apply the felony-murder rule, where the underlying felony was armed robbery, a crime inherently dangerous to human life, and where the charge as a whole sufficiently informed the jury of the requirements for applying the felony-murder rule. [784-787]

At the trial of a criminal case the judge did not err in excluding a doctor's testimony concerning communications made to him by members of the defendant's family and by psychologists who had examined the defendant where the defendant did not plan to ask the doctor for an expert opinion based on these communications, and where, after the defendant had testified to much of the information he initially tried to introduce through the doctor, defense counsel informed the judge that he had decided not to have the doctor testify further. [787-788]

INDICTMENTS found and returned in the Superior Court Department on January 9, 1981.

The cases were tried before *Mulkern,* J.

*Stephen J. Kiely* for the defendant.

*Daniel F. Toomey,* Assistant District Attorney, for the Commonwealth.

LYNCH, J. The defendant, John F. Currie, appeals from his convictions by a jury of murder in the first degree, armed assault with intent to rob, and the unlawful carrying of a firearm. The judge sentenced the defendant to imprisonment for life on the murder conviction, a concurrent eighteen to twenty year term on the armed assault with intent to rob conviction, and to a concurrent three to five year term on the firearm conviction. The defendant now appeals from these convictions. He argues that the judge below committed reversible error (1) by failing to suppress certain statements the defendant made subsequent to his arrest, (2) by improperly charging the jury on the applicability of the felony-murder rule, and (3) by refusing to allow the defendant to present psychiatric testimony relating to family history and drug abuse. Additionally, the defendant urges us to exercise our power under G. L. c. 278, § 33E, to reduce his conviction of murder in the first degree to murder in the second degree. After reviewing the record we conclude that the judge did not commit error in any of the actions challenged by the defendant and we perceive no reason for exercising our G. L. c. 278, § 33E, power. Accordingly, we affirm the defendant's convictions.

There was evidence from which the jury could have found the following: On the afternoon of December 10, 1980, Milford Savings Bank employee Michael Hogarth, accompanied by Milford police Sergeant Walter F. Conley, was returning on foot to the bank after depositing a bag of coins in a bank across the street. As they walked back a blue station wagon driven by the defendant John Currie, with Patrick O'Shea seated in the passenger's seat, rapidly approached them. Currie and O'Shea had been waiting in a nearby parking lot to rob the bank employee, who they erroneously believed would be carrying a large amount of money between the banks. When the station wagon drew near Sergeant Conley and Hogarth, O'Shea demanded that they give him the bag. Sergeant Conley reached for his gun

and both O'Shea and Currie began shooting at him. O'Shea fired several shots from an M-14 rifle and Currie fired two shots from a nine-millimeter handgun. Sergeant Conley was struck by bullets fired from the rifle but not by any bullets fired by Currie. Sergeant Conley was transported to a local hospital where he died from his wounds.

Following the shooting, the defendant and O'Shea sped away from the scene in the station wagon. They returned to a motel room in Framingham where they remained with two female accomplices. After discovering that Sergeant Conley had died, they made plans to flee the State. They left the motel at 7 P.M., intending to go to California. During this time, intensive investigation by State and local police had uncovered the identity of the two female accomplices, who were arrested shortly thereafter. The police learned the identities of O'Shea and Currie from these women and obtained a description of the vehicle they were driving. At approximately 6:45 A.M., on December 11, an "all points bulletin" was broadcast which sought the arrest of Currie and O'Shea in connection with the shooting. That bulletin was read by New York State police Trooper Leroy Schultz. At approximately 9:50 A.M., Trooper Schultz observed a vehicle matching the description in the bulletin speeding on the New York State Thruway. Trooper Schultz followed the vehicle for about four miles and then ordered the vehicle to pull to the side of the road. Schultz radioed for help and, when Trooper A. L. Lonsberry arrived, they arrested Currie and O'Shea.

1. *The motion to suppress.* After the defendant was arrested he made several inculpatory statements to the New York and Massachusetts police. Prior to his trial, he moved to suppress these statements arguing primarily that they had been obtained in violation of his Sixth Amendment right to counsel during interrogation. *Miranda* v. *Arizona,* 384 U.S. 436 (1966). After a full hearing on the motion the judge below denied the motion. The judge found that the defendant knowingly, intelligently, and voluntarily waived his rights under the Fifth, Sixth, and Fourteenth Amend-

ments to the United States Constitution after receiving the required Miranda warnings. The judge made the following findings of fact.

Following their arrest by the New York State police, Currie and O'Shea were transported to the police station at New Hartford and placed in separate rooms. At approximately 11 A.M., New York State police Senior Investigator Donald B. Smith arrived to interrogate Currie. Smith read Currie the Miranda warnings and informed him that he was a suspect in a robbery and a homicide. Currie acknowledged that he understood the warnings and waived his rights by signing a "Statement and Notification of Rights," which was a printed form bearing the Miranda warnings, and by placing a checkmark beside each of the enumerated rights. Currie initially gave the New York investigators an alibi statement. However, shortly thereafter, Smith informed Currie that O'Shea had admitted to his involvement in the Milford shooting and implicated Currie as the shooter. O'Shea was brought into the room, where he told Currie that he had confessed to everything and advised Currie that he should get out of it the best way he could. O'Shea was then taken from the room.

After considering what O'Shea had told him, Currie agreed to make an oral statement to the New York officers. This statement lasted from 1 P.M. to 3 P.M. Currie described the plans for the robbery, the actual shooting, and the subsequent attempt to escape. He also made a diagram of the homicide scene.[1]

At approximately 4 P.M., Sergeants Eugene D. Mattioli and Joseph Doheny of the Massachusetts State police arrived at the New Hartford station. Sergeant Mattioli engaged in a short discussion with the New York police involved in the arrest and questioning of Currie and then was brought in to see Currie. Sergeant Mattioli told Currie

---

[1] In his motion prior to trial Currie sought to suppress these statements made to the New York police. The judge ruled that these statements were voluntarily given after Currie knowingly and intelligently waived his rights. The defendant does not challenge this ruling on appeal.

that he also wanted to question Currie about the shooting. First, though, Sergeant Mattioli advised Currie of his Miranda rights again and Currie again agreed to waive those rights. He signed a waiver form at 4:45 P.M. At approximately 5 P.M., Sergeant Mattioli began to reduce Currie's statement to a written form.

While Sergeant Mattioli was interrogating Currie, Attorney Harry C. Mezer called the New Hartford station on behalf of Currie's mother. Mr. Mezer spoke with New York State police Senior Investigator Daniel J. Arcuri. Arcuri was unaware that the Massachusetts police had arrived. When Mr. Mezer requested to speak with Currie, Arcuri suggested that Mr. Mezer should wait until the Massachusetts police had arrived, which Arcuri believed would be momentarily. Arcuri told Mr. Mezer that he should call back. Arcuri subsequently learned that the Massachusetts police had already arrived and when Mr. Mezer called back at 5:22 P.M., Arcuri transferred the call to Sergeant Mattioli. At this time Mattioli had transcribed the first paragraph of what would become Currie's written statement.

Mr. Mezer identified himself to Sergeant Mattioli and stated that his office would probably represent Currie. Mr. Mezer told Mattioli not to question Currie further but Mattioli informed Mr. Mezer that if Currie still wanted to talk after speaking with Mr. Mezer, he would continue to question Currie. Mattioli then gave the phone to Currie who spoke with Mr. Mezer for a few minutes. Mr. Mezer testified at the hearing that he had advised Currie not to talk to the police further and that Currie had acknowledged that he understood what Mr. Mezer had said. After Currie completed his conversation with Mr. Mezer, Sergeant Mattioli asked Currie if he wanted to continue his statement. Currie agreed and Mattioli took the added precaution of again advising Currie of his rights and obtaining another waiver from Currie. Mattioli incorporated this further administration of the Miranda warnings into the written statement, together with reference to Currie's conversation with Mr. Mezer. Mattioli and Currie then completed the statement.

Currie read the written statement, suggested the addition of one detail, and signed it.

The defendant argues that his statement and waiver of rights were improperly obtained because the Massachusetts and New York authorities intentionally inhibited Mr. Mezer's efforts to contact him. However, the judge below found from the testimony presented at the hearing that the New York and Massachusetts police cooperated fully with Mr. Mezer to the extent of their knowledge of the circumstances. The judge found that no interference, intentional or otherwise, could be inferred from the facts in this case.

Under our established principle of appellate review, where subsidiary findings of fact are made by the judge below, this court will accept those findings absent clear error. *Commonwealth* v. *White,* 374 Mass. 132, 137 (1977), aff'd, 439 U.S. 280 (1978). Our review of the testimony offered at the suppression hearing reveals no error in the judge's finding that the police cooperated with Mr. Mezer in his attempt to contact Currie. Although Investigator Arcuri did not permit Mr. Mezer to speak with Currie when Mr. Mezer first called at 4:57 P.M., his suggestion that Mr. Mezer wait until the Massachusetts police had arrived was reasonable. That Arcuri was unaware of the arrival of the Massachusetts police was also reasonable. At the time of Mr. Mezer's call Arcuri was involved with the investigation of the defendant's vehicle and was also handling inquiries from news media. Mr. Mezer did not tell Arcuri that he represented Currie nor had Currie asked for a lawyer. When Arcuri discovered his error as to the presence of the Massachusetts police, he immediately connected Mr. Mezer with Sergeant Mattioli when Mr. Mezer called back. After a brief conversation with Mr. Mezer, Mattioli permitted Currie to speak with Mr. Mezer. Nothing in this conduct by the New York or Massachusetts police suggests that these authorities purposefully interfered with the defendant's access to counsel or pursued a "course of conduct calculated to circumvent . . . [the defendant's] constitutional rights to

have the benefit, aid, and counsel of his attorney" which was condemned in *Commonwealth* v. *Mahnke,* 368 Mass. 662, 692 (1975), cert. denied, 425 U.S. 959 (1976). See also *Commonwealth* v. *Cote,* 386 Mass. 354, 360 (1982) (no findings by judge that "police purposefully interfered with the defendant's access to a specific attorney who the police knew represented the defendant"). The circumstances presented here provide no reason for suppressing the defendant's statements.

The defendant further argues that Sergeant Mattioli was obligated to cease questioning Currie after Mr. Mezer ordered him to do so.[2] The defendant contends that this cessation of questioning is constitutionally mandated by the United States Supreme Court decision in *Brewer* v. *Williams,* 430 U.S. 387 (1977), and argues that a valid waiver of this right to counsel may not be obtained in the absence of the defendant's lawyer after the defendant has once spoken with the lawyer. The defendant's reliance on *Williams* is mistaken.

In *Williams,* the defendant had called his lawyer prior to his surrender to the police. At that time, the defendant was in a town several hundred miles from his lawyer in Des Moines. The lawyer arranged with the police for the defendant to surrender himself and for the police to transport the defendant back to Des Moines. The defendant's lawyer requested that the police not interrogate the defendant until after he had again spoken with his lawyer and the police agreed to this request. When the defendant surrendered to the police, a second lawyer representing the defendant at the site of his surrender instructed the police not to question him on the trip and the police again agreed. While in the vehicle, the defendant repeatedly stated that he would give a full statement to the police after he consulted with his lawyer in Des Moines. Despite the defendant's repeated

---

[2] Since the defendant, the lawyer, and the interrogating policeman were all from Massachusetts, and since the crime occurred there, we assume without deciding that Massachusetts law applies. No argument is advanced that the law of any other jurisdiction governs.

assertion of his right to counsel and despite the express agreement by the police not to question the defendant, the police proceeded to interrogate the defendant on the return trip and elicited a number of incriminating admissions. *Id.* at 390-393.

On these facts, the Supreme Court held that the police failed to obtain a valid waiver from the defendant of his right to counsel. Contrary to the defendant's argument here, the Supreme Court did not hold that a defendant cannot waive his right to counsel in the absence of counsel after he had previously consulted with this counsel. Rather the Supreme Court stated: "The Court of Appeals did not hold, nor do we, that under the circumstances of this case [the defendant] *could not,* without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments. It only held, as do we, that he did not" (emphasis in the original). *Id.* at 405-406. The Court concluded that Williams' "consistent reliance upon the advice of counsel in dealing with the authorities refutes any suggestion that he waived that right" and consequently the State was not able to meet its heavy burden of showing a knowing, intelligent, and voluntary waiver of his right to the assistance of counsel. *Id.* at 404, 405.

By contrast in this case, Currie never asserted his right to counsel. The police advised the defendant of this right several times, the last time after he had consulted with Mr. Mezer, and he consistently waived this right, orally and in writing. The defendant continued with his statement to Sergeant Mattioli even though he was aware that he had the right to await the arrival of counsel. Although Mr. Mezer ordered the police to stop questioning Currie, the right was not Mr. Mezer's to assert. Currie told Mr. Mezer that he understood his advice to remain silent, but Currie decided to reject it. No constitutional violation results from police interrogation following such actions by the defendant.

The Supreme Court has held that the waiver of the right to counsel must be closely scrutinized and must be determined from all the circumstances of the case. *North Caro-*

*lina* v. *Butler*, 441 U.S. 369, 374-375 (1979). The judge below reviewed all the facts and concluded that the defendant knowingly, intelligently, and voluntarily waived his rights. Although this ultimate finding by the judge is open to review, a finding of "voluntary waiver, . . . [is] entitled to substantial deference by this court." *Commonwealth* v. *White*, 374 Mass. 132, 138 (1977). However, in fulfilling our appellate function we must make an independent determination of the correctness of the judge's application of constitutional principle to the facts found. *Commonwealth* v. *Tavares*, 385 Mass. 140, 145 (1982). From our review of the record we determine that each of the defendant's several waivers was validly obtained in accord with proper constitutional procedure and the judge correctly denied the defendant's motion to suppress.

2. *Application of the felony-murder rule.* The defendant next contends that the judge's charge was insufficient because he failed to instruct the jury that they must find conscious disregard of risk to human life in the underlying felony in order to apply the felony-murder rule. In *Commonwealth* v. *Moran*, 387 Mass. 644, 651 (1982), we held that such an instruction was necessary where the underlying felony is unarmed robbery. However, we find that, here, that specific instruction was unnecessary since the judge's charge as a whole sufficiently informed the jury of the requirements for applying the felony-murder rule.[3]

In three recent cases we have had the opportunity to consider the proper scope and applicability of this State's felony-murder rule. In *Commonwealth* v. *Matchett*, 386 Mass. 492 (1982), we observed that the felony-murder rule "is based on the theory that the intent to commit the felony is equivalent to the malice aforethought required for murder. 'For this theory to be tenable the nature of the felony

---

[3] The defendant also challenges the constitutionality of the felony-murder rule. We have recently considered such a challenge and reaffirmed the constitutionality of the rule. *Commonwealth* v. *Moran*, 387 Mass. 644, 648-650 (1982). See *Commonwealth* v. *Watkins*, 375 Mass. 472, 485-488 (1978).

must be such that an intent to commit that crime exhibits a conscious disregard for human life . . . .'" *Id.* at 507, quoting *Commonwealth* v. *Bowden,* 456 Pa. 278, 287 (Nix, J., concurring). Thus, we held that "when a death results from the perpetration or attempted perpetration of the statutory felony of extortion, there can be no conviction of felony-murder in the second degree unless the jury find that the extortion involved circumstances demonstrating the defendant's conscious disregard of the risk to human life. The crime of extortion may be committed in a way not inherently dangerous to human life." *Id.* at 508.

In *Commonwealth* v. *Moran,* 387 Mass. 644 (1982), we extended the holding of *Matchett* to unarmed robbery. We noted that the *Matchett* "principle applies as well to felony-murder based on unarmed robbery. Unarmed robbery is not inherently dangerous to human life. . . . Punishing as murder homicides that result from such crimes without proof of a culpable mental state with respect to the killing violates the *Matchett* principle. Accordingly, we hold that, where the underlying felony is unarmed robbery, the felony-murder rule applies only if the jury find from the circumstances of the felony that the defendant consciously disregarded risk to human life." *Id.* at 651.

The defendant now invites us to extend the *Matchett* principle to this case of armed robbery. This we decline to do. The *Matchett* principle applies only to felonies that are not inherently dangerous. We conclude that the felony of armed robbery, committed with a loaded gun, may not "be committed in a way not inherently dangerous to human life." *Commonwealth* v. *Matchett, supra* at 508. See also *Commonwealth* v. *Watson, ante* 536, 544 (1983) ("In the circumstances of this case, involving the use of a gun, the armed robbery inherently involved a conscious disregard of risk to human life").

In the circumstances of this case, involving the use of guns by both the defendant and his confederate, the armed robbery inherently involved a "conscious disregard of the risk to human life," *Commonwealth* v. *Matchett, supra.* Conse-

quently the defendant could be convicted of murder in the first degree under the felony-murder rule based on the underlying inherently dangerous felony of armed robbery without a *Matchett* type of instruction, "provided the jury were properly instructed as to what they had to find in order to return such a verdict against [the defendant]." *Commonwealth* v. *Watson, supra* at 544. We find that the judge's charge adequately met this requirement.

The Commonwealth presented its case for application of the felony-murder rule based on the theory that if Sergeant Conley was killed during the course of an attempted armed robbery then the defendant was guilty of murder in the first degree. The judge in his charge instructed the jury that to apply the felony-murder rule they must "determine whether or not John Currie, if you find he was there, was actively engaged in, participating with O'Shea in the attempted commission of an armed robbery." The judge also instructed the jury that if they found that "during an attempted armed robbery, as a natural and probable consequence of it, an innocent victim is killed, then [they] would be warranted in finding that his death was the result of murder in the first-degree." Further, the jury was informed that if they should find that Currie was "a joint participant with somebody else in a felony, an attempted armed robbery, and should you find that a homicide occurred, a killing occurred in the commission or attempted commission of that felony, that attempted armed robbery, then that person's complicity in that felony, his activity involved in this felony, if you find that he was actively involved, that would be sufficient to establish his guilt for the homicide, for the murder in the first-degree." Thus, the jury was instructed that they must first find that the defendant was an active participant in an armed robbery prior to applying the felony-murder rule. This case is quite different from the recently decided case of *Commonwealth* v. *Watson, supra,* where it was unclear whether the jurors found that the defendant knew or should have known that

one of the other defendants acting with him in the commission of the crime had a gun. Since we hold that armed robbery with a loaded gun is inherently dangerous we conclude that the judge's charge was adequate.

3. *Exclusion of hearsay testimony.* The defendant also argues that the judge below committed reversible error by excluding certain testimony of Dr. William James. Dr. James testified at the trial and the defendant sought to elicit his testimony about communications made to Dr. James by members of the defendant's family and by psychologists who had examined the defendant concerning the defendant's family history and drug abuse. The judge refused to allow this testimony to be presented through Dr. James because the statements were hearsay. The judge ruled that these hearsay statements could be related by Dr. James only if they were the predicate for an expert opinion about the defendant's criminal responsibility to which Dr. James would testify. The defendant's lawyer conceded that he would not ask Dr. James to give his opinion as to the defendant's ability to form the required specific intent for these crimes because Dr. James had concluded that the defendant was criminally responsible at the relevant times. The judge then ruled the statements inadmissible as hearsay but suggested that the defendant should call as witnesses the sources of the proffered hearsay testimony. The defendant's lawyer said he would do so.

However, rather than calling these witnesses, the defendant's lawyer offered a motion to reconsider the exclusion order and made an offer of proof. The defendant's offer of proof did not indicate that Dr. James would have testified to the defendant's inability to form the necessary specific intent but rather only repeated that Dr. James would testify as to the hearsay communications. The judge did not rule on this motion. He stated that if the evidence from the hearsay sources were introduced through the witnesses themselves an opinion by Dr. James based on these statements could be introduced.

After the defendant himself had testified to many of the historical family events that the defendant initially tried to introduce through Dr. James, the judge stated that he was now inclined to allow Dr. James to testify concerning the previously excluded hearsay testimony. However, after considering recalling Dr. James, the defendant's lawyer informed the judge that he had decided not to have Dr. James testify further. Thus, the final decision not to have Dr. James testify appears to have been a reasonable tactical decision made by the defendant's lawyer. See *Commonwealth* v. *Levia*, 385 Mass. 345, 353 (1982); *Commonwealth* v. *Adams*, 374 Mass. 722, 728-729 (1978).

From our review of these facts we find that the judge committed no error in his initial order excluding the hearsay testimony. In *Commonwealth* v. *Sheehan*, 376 Mass. 765, 772-773 (1978), we held that the judge properly excluded testimony by the defendant's psychiatric witness where the defendant's offer of proof did not indicate that the expert witness would testify that the defendant was incapable of forming the necessary intent. The circumstances for exclusion are even more compelling here where, by the defendant's lawyer's admission, the expert witness had concluded that the defendant had the capacity to form the necessary intent. Since this testimony as to the defendant's history was not offered to illuminate the basis for the witness's expert opinion, the judge properly excluded it as inadmissible hearsay.[4]

4. We have reviewed the entire record of this case. We find no reason to reduce the jury's verdict of murder in the first degree or to grant any other relief under our G. L. c. 278, § 33E, power.

*Judgments affirmed.*

___

[4] We note that any prejudice that may have occurred from exclusion of this witness's hearsay testimony was largely mitigated by the defendant's testimony as to these facts, the failure of the defendant's lawyer to call the witnesses who had made the statements, and the defendant's lawyer's tactical decision not to recall Dr. James.