COMMONWEALTH vs. VAO SOK.

Suffolk. October 5, 2001. - February 1, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & CORDY, JJ.

*Constitutional Law*, Assistance of counsel, Admissions and confessions, Waiver of constitutional rights. *Practice, Criminal,* Assistance of counsel, Voluntariness of statement, Capital case. *Evidence,* Admissions and confessions, Polygraph test, Expert opinion. *Waiver. Committee for Public Counsel Services. Attorney At Law,* Canons of ethics. *Witness,* Expert.

Where, despite having been provided with specific information regarding his attorney's efforts to reach him and to stop all questioning by police, a criminal defendant chose to continue with a polygraph examination and to speak with the police, that waiver of the defendant's right to counsel was valid in the circumstances, as the defendant declined a specific offer of assistance by an identified attorney and the defendant had sufficient information to make a voluntary, knowing, and intelligent waiver of his Miranda rights [746-753]; to the extent a police officer failed to immediately inform the defendant of the attorney's attempts to render assistance, no admission or confession was obtained from the defendant in the interim and, as such, any neglect was harmless beyond a reasonable doubt, where it did not contribute in any way to the defendant's convictions [753].

There was no merit to a criminal defendant's contentions that an assistant district attorney who directed police to continue interrogating the defendant after being informed that he was represented by counsel both in a murder case and in another matter violated art. 30 of the Massachusetts Declaration of Rights or Mass. R. Prof. C. 4.2. [753-754]

At a criminal trial, there was no error in the judge's allowing the Commonwealth's motion to exclude evidence of the efforts of counsel to reach the defendant and stop interrogation by police, where the excluded evidence, although relevant to the legal question whether the defendant knowingly and intelligently waived his Miranda rights, was irrelevant to the question of the voluntariness of the defendant's statement to the police. [754-757]

At a criminal trial, there was no abuse of discretion in the judge's exclusion of expert testimony, offered during redirect examination, on the subject of waiver of Miranda rights, where the testimony would not have appreciably enhanced or added to the testimony given on direct examination. [757-758]

A criminal defendant was not denied the effective assistance of counsel, based on trial counsel's alleged abandonment of the defense of identity in favor of evidence of so-called diminished capacity, where trial counsel's strategy was not manifestly unreasonable. [758]

INDICTMENTS found and returned in the Superior Court Department on May 28, 1992.

A pretrial motion to suppress evidence was heard by *Patrick F. Brady,* J.; the cases were tried before *Vieri Volterra,* J., and a motion for a new trial, filed on March 2, 2000, was heard by him.

*Ruth Greenberg* for the defendant.

*Brian J.S. Cullen,* Assistant District Attorney (*David E. Meier,* Assistant District Attorney, with him) for the Commonwealth.

SPINA, J. The defendant was convicted of murder in the first degree of five year old Anmorian Or on a theory of felony-murder predicated on the felonies of rape of a child by force and aggravated rape (by kidnapping). He was also convicted of rape of a child by force, and of kidnapping. His motion for a new trial, which raised all the claims raised on appeal, was denied. The defendant's appeal from the denial of his motion for a new trial has been consolidated with his direct appeal. On appeal he claims that the motion to suppress his statement should have been allowed because police failed to advise him that his attorney was trying to communicate with him during their interrogation.[1] He claims error in the exclusion at trial of testimony relevant to the question of the voluntariness of his statement. Finally, the defendant claims that he was denied the effective assistance of counsel, based on trial counsel's alleged abandonment of the defense of identity in favor of evidence of so-called diminished capacity. We affirm the convictions and decline to exercise our power under G. L. c. 278, § 33E.

On May 15, 1992, the grandmother of Anmorian Or was taking care of her while her parents were at work. The child was last seen at about 1:30 P.M. playing on the sidewalk outside the family's apartment at 146 Shirley Avenue in Revere. Her parents rushed home that afternoon after the grandmother telephoned them to report that Anmorian was missing.

Anmorian's father looked for her in the apartment building where they lived. Several apartments were locked, including apartment no. 3A. He also accompanied police, who looked for

---

[1] The motion to suppress was allowed in part. The Commonwealth did not appeal from that order.

Anmorian throughout the neighborhood. The next morning he again went through the apartment building, but this time apartment no. 3A was unlocked. He entered and found Anmorian lying on the bedroom floor in a semiconscious state. He carried her back to their apartment, where relatives telephoned for an ambulance. She was taken to Massachusetts General Hospital where she died on May 19, 1992.

Anmorian suffered brain damage, consistent with a depletion of oxygen caused by strangulation. She died from encepholopathy caused by asphyxiation, consistent with strangulation for an extended period of time. She also suffered trauma to her genital area consistent with the insertion of an object into her vagina.

The last person to see Anmorian alive was Joseph James, who waited with his dogs across the street from Anmorian's apartment building while his wife was shopping in a nearby store. For more than one hour he watched Anmorian playing on the sidewalk in front of the apartment building. A man of Asian descent was near her. He wore a multi-colored hat with a turned-up visor, dark pants, and a shirt. He was holding a can of beer in his hand. He was the only adult near Anmorian. James and his wife left the area at about 1:30 P.M., and Anmorian and the man were still in the same area. James picked out three photographs of men who resembled the man he saw from an array of 112 photographs. One of the three photographs depicted the defendant.

The defendant lived in the same apartment building as the Ors, and he was a handyman for the landlord. He had a key to apartment no. 3A, which was known as the "maintenance man's room." It was used to store tools and equipment used in the deleading of other apartments, as well as appliances from apartments being deleaded. Other workers went to the defendant to gain access to apartment no. 3A.

The defendant gave several statements to the police between May 17 and May 21. On May 17 he told police that, although he had heard "a kid was missing," he did not know who it was. He also told police that he spent the afternoon of May 15 drinking beer on the front steps of the apartment building, starting at about 1 P.M. He said his roommate, Map Sem, was with him. The Commonwealth offered evidence that, contrary to his claim

of ignorance on May 17 that Anmorian was missing, the defendant asked her father on May 16 if he had found his daughter. The Commonwealth also offered evidence that Map Sem had been working all day on May 15, and thus could not have been drinking with the defendant. On May 21, the defendant admitted that he choked Anmorian because she would not give him money. He said he could not recall whether he also had raped her. He attributed his conduct to the use of cocaine.

Pubic hair found in Anmorian's vaginal area matched samples provided by the defendant. PGM enzyme blood-grouping tests conducted on seminal fluid found on Anmorian's shorts excluded over ninety-three per cent of the male population as a possible source. Similar tests were performed on blood samples provided by the defendant. He was not excluded.

The defendant presented psychiatric testimony at trial that he was mildly retarded, that he had a history of substance abuse, and that he suffered from posttraumatic stress disorder, and that these factors impaired his ability deliberately to premeditate and act with malice. The jury rejected theories of deliberately premeditated murder and extreme atrocity or cruelty, but found him guilty of felony-murder.

1. *Motion to Suppress.*

The defendant contends that his statements should have been suppressed because police failed to advise him that his counsel wished to be present and failed to offer him the opportunity to speak with counsel in violation of art. 12 of the Massachusetts Declaration of Rights. See *Commonwealth* v. *Mavredakis*, 430 Mass. 848 (2000). The defendant further argues that an assistant district attorney who directed the police to continue interrogating the defendant after being informed that he was represented by counsel both in the murder case and in another matter, violated art. 30 of the Massachusetts Declaration of Rights and Mass. R. Prof. C. 4.2, 426 Mass. 1402 (1998). We summarize the facts found by the motion judge, and supplement those facts with testimony that was not contested at the hearing on the motion to suppress. See *Commonwealth* v. *Melvin*, 399 Mass. 201, 202 (1987).

On May 17, 1992, Sergeant Detective Steven Pisano of the

Revere police department, who was in charge of the investigation of the rape of Anmorian Or, questioned the defendant at the Revere police station. He first checked probation records and learned that the defendant was released on bail on a rape charge in Essex County.[2] Speaking through a Khmer interpreter, Pisano asked the defendant if he would be willing to talk to him about Anmorian Or. The defendant agreed to speak with him.

Pisano read the defendant his Miranda rights from a card through the interpreter. The defendant signed the card, acknowledged that he understood his rights, and agreed to speak. Pisano then spent several hours interviewing the defendant, repeatedly telling him both that he was free to leave and that he was free to stop the interview. The defendant told Pisano that he had been arrested in Lynn for rape and kidnapping. Pisano asked if he had a lawyer for that case. The defendant said that he was represented by John Andrews and produced his business card. Pisano asked if he would like to call Andrews for advice, but the defendant declined and said that he wanted to continue without a lawyer. Pisano asked the defendant to describe what he had been doing over the previous two days. The defendant denied any involvement in Anmorian Or's disappearance. During the interview, Pisano informed the defendant that a foreign pubic hair was found on Anmorian, and asked the defendant if he would agree to provide a pubic hair sample. The defendant obliged. Pisano then conducted a second interview of the defendant, this time with Sergeant Steven Wallace of the Revere police department. The interview was tape recorded, and began with a renewal of the Miranda warnings. After the second interview, the defendant left the Revere police station.

As a result of Anmorian's death on May 19, Sergeant Pisano was no longer a primary investigating officer. Lieutenant William Gannon, a detective in the homicide unit, became involved

---

[2]The defendant was found indigent in the Essex case and the court appointed the Committee for Public Counsel Services (CPCS) to represent him. Attorney John Andrews, a staff attorney in that office, filed his appearance for the defendant. To the extent that the motion judge found that the defendant, through the Essex case, had achieved a certain level of familiarity, both with Miranda warnings and the adversary system in general, the defendant does not challenge those findings as clearly erroneous, nor does the record indicate as much.

in the investigation for the Revere police, along with Sergeant Wallace. Lieutenants John Perry and John McDonough of the State police also became involved. That evening, the defendant agreed to return to the Revere police station for an interview with Gannon and Perry. He came to the station with his roommate, Map Sem. Gannon arranged for the services of a certified Cambodian court interpreter. When the defendant arrived, Gannon advised him of his Miranda rights through the interpreter. The defendant waived his rights and gave a statement that was tape recorded. During the course of the interview, Gannon asked the defendant for permission to search his apartment. He also asked the defendant if he would agree to take a polygraph examination. The defendant agreed to both requests. During a search of the defendant's apartment, several items of clothing were seized. While officers were searching his apartment, Perry asked the defendant if he would agree to submit blood and hair samples. The defendant consented.

On May 21, Lieutenant Gannon and Sergeant Wallace picked up the defendant and the interpreter and drove them to the Bioran Laboratory in Cambridge, where they met Perry. Perry again told the defendant, through the interpreter, that providing the samples must be voluntary, and that he did not have to comply. The defendant consented and a Bioran technician took hair and blood samples. The defendant was then taken to Southborough for a polygraph examination. Prior to the polygraph examination, Perry requested another pubic hair sample. The defendant again consented and provided an additional sample.

Sergeant John Consigli of the State police was assigned to administer the polygraph examination. After informing the defendant that he did not have to submit to the examination, he asked the defendant for his written consent, which the defendant gave. While the interpreter translated the consent form to the defendant, Consigli left his office to meet with Revere officers for a briefing on the case.

Before administering the polygraph examination, Consigli explained the nature of the polygraph examination to the defendant through the interpreter. He then asked the defendant for his version of the events of May 17. Meanwhile, Andrews had learned from an Essex County assistant district attorney

that the defendant was a suspect in the murder investigation. Andrews met with his supervisor, Lawrence McGuire, and they decided to attempt to render assistance to the defendant. Because Andrews was not certified by the Committee for Public Counsel Services (CPCS) for murder cases, McGuire sought appointment to represent the defendant. McGuire was appointed sometime between 3:30 P.M. and 4 P.M. on the afternoon of May 21 to represent the defendant in the murder case.

While McGuire was requesting appointment, Andrews telephoned Sergeant Pisano at the Revere police station. He explained that he represented the defendant in the unrelated rape case in Essex County, and that he believed the defendant was in the custody of the Revere police. He told Pisano that he wanted any questioning stopped so that he could be present to assist the defendant. Pisano, who had recently arrived at the station, had not been updated on the defendant's case. He informed Andrews that it was not his case, and that he would contact Lieutenant Gannon and get back to him. At 4:21 P.M., Andrews transmitted by facsimile a letter to Pisano documenting their conversation.

Pisano told Gannon of his conversation with Andrews. Gannon said that he would get back to him. Gannon telephoned a Suffolk County assistant district attorney assigned to the case, relaying what Pisano had told him.[3] The assistant district attorney telephoned Andrews. Andrews stated that he was not assigned to the case, but said that he represented the defendant in the unrelated rape case in Essex County. Andrews reiterated that he wanted to see the defendant, and that he wanted all questioning and polygraphs stopped. The assistant district attorney informed Andrews that the defendant was currently being polygraphed and said that he did not want to have an attorney present.

At about the same time McGuire telephoned Consigli, whom he knew from prior cases. McGuire said that his office represented the defendant in the unrelated rape case and that he represented the defendant in the murder case. McGuire asked whether the defendant was there. Consigli said that the

---

[3]That assistant district attorney was not appellate counsel for the Commonwealth.

defendant was there and was being polygraphed. McGuire stated that he wanted the polygraph stopped and that he did not want Consigli to question him any further. Consigli said that he would consult with his supervisors and get back to McGuire. Consigli then left the interview room and advised the Revere police officers what had happened. Gannon was either on the telephone with the assistant district attorney, or he then telephoned her. Consigli then spoke with the assistant district attorney and she told him to continue with the polygraph examination.

When Consigli returned to the interview room, he informed the defendant that his attorney had called from Salem and had told Consigli not to continue with the polygraph. The defendant asked if it was Andrews who had called. Consigli responded, "No," that it was McGuire, who said that he was trying to locate the defendant for Andrews, and that McGuire had said not to continue questioning the defendant. Consigli said the decision to continue was up to the defendant. The defendant said that he would like to continue.

Consigli then continued with a pretest interview of the defendant. He administered the polygraph examination. At the end of the examination, Consigli told the defendant that he thought that his answers appeared to be deceptive. He told the defendant that he suspected that he was involved and that it was important that the defendant tell him the truth. The defendant then made incriminatory remarks, confessing to having choked Anmorian Or.

The motion judge, who did not have the benefit of our decision in *Commonwealth* v. *Mavredakis*, 430 Mass. 848 (2000), nonetheless recognized that art. 12 might require suppression if the police engaged in the "improper conduct" of not informing the defendant of his attorney's efforts to render assistance. He found, however, that, because Consigli informed the defendant that McGuire did not want him talking to the defendant, the defendant's art. 12 rights were not violated. The judge also found that the defendant, who was familiar with the adversary nature of criminal proceedings, was well aware of his right to counsel and declined to request counsel knowing that he was represented by Andrews in his Essex County case, and having Andrews's business card at the time.

In reviewing a judge's determination regarding a valid waiver of Miranda rights and voluntariness, we "accept[] the judge's subsidiary findings of fact absent clear error, give[] substantial deference to the judge's ultimate findings and conclusions of law, but independently review[] the correctness of the judge's application of constitutional principles to the facts found." *Commonwealth* v. *Mello*, 420 Mass. 375, 381 n.8 (1995). The Commonwealth has the burden of establishing the validity of a Miranda waiver beyond a reasonable doubt. See *Commonwealth* v. *Magee*, 423 Mass. 381, 386 (1996). "To be valid the waiver must be made voluntarily, knowingly, and intelligently." *Commonwealth* v. *Edwards*, 420 Mass. 666, 670 (1995).

Prior to our decision in *Commonwealth* v. *Mavredakis, supra,* we had decided several cases involving the failure of police to inform a suspect of an attorney's attempt to render assistance. In each case, we said that the failure to inform the suspect of the attorney's efforts rendered his Miranda waiver inoperative. See *Commonwealth* v. *Sherman*, 389 Mass. 287, 295-296 (1983); *Commonwealth* v. *Mahnke*, 368 Mass. 662, 691-693 (1975), cert. denied, 425 U.S. 959 (1976); *Commonwealth* v. *McKenna*, 355 Mass. 313, 324 (1969).

In *Commonwealth* v. *Mavredakis, supra* at 860, we held that "the duty to inform a suspect of an attorney's efforts to render assistance is necessary to actualize the abstract rights listed in *Miranda* v. *Arizona*, 384 U.S. 436 (1966)." The failure of police to inform a suspect of his or her attorney's efforts to render assistance affects his knowledge at the time of a Miranda waiver because a suspect's waiving the abstract Miranda right to an attorney might react differently to a specific offer of assistance. *Id.* at 859-860. Accordingly, when an attorney identifies himself or herself to the police as counsel acting on a suspect's behalf, art. 12 requires the police to stop their questioning and inform the suspect of the attorney's availability immediately. *Id.* at 861.

If the suspect accepts the attorney's offer of assistance, the police must suspend questioning until the suspect consults with the attorney. *Id.* We acknowledged in *Mavredakis*, however, that a suspect may choose to decline the attorney's offer. *Id.* To this extent, an attorney's directive to the police to stop questioning the defendant requires only that they terminate questioning long

enough to afford the defendant the opportunity to avail himself of the attorney's advice. See *Commonwealth* v. *Currie,* 388 Mass. 776, 783 (1983) (fact that defendant spoke with attorney did not obligate interrogating officer to cease questioning despite attorney's order to do so, because defendant rejected attorney's advice and continued with interrogation). After being informed of the availability of counsel, if the defendant decides to continue, and otherwise has validly waived his Miranda rights, the police may continue despite the attorney's direction to stop questioning. *Id.*

Here, the motion judge found that Consigli told the defendant that McGuire wanted the polygraph examination to be terminated, that he was attempting to locate the defendant on behalf of Andrews, and that he wanted all questioning of the defendant to end. The defendant places great emphasis on the failure specifically to inform him that Andrews attempted to reach him and that Andrews wanted to speak with him and to be present for any further questioning.[4] There is no requirement that police deliver verbatim to a defendant the message given by his attorney. Consigli told the defendant that McGuire did not want the polygraph to continue and did not want any further questioning of the defendant. To the extent that the defendant suggests that Consigli misled the defendant to believe that Andrews was not the source of the advice, that contention is belied by Consigli's statement to the defendant that McGuire was attempting to locate the defendant for Andrews. During an interrogation four days earlier, the defendant declined a specific offer to contact Andrews, whom he knew and whose business card he carried on that date. The defendant was adequately apprised of his right to counsel. He had actual knowledge of the availability of an identifiable attorney, if not attorneys. He was made aware not only that an attorney was attempting to assist him, but that he could stop the questioning and speak with a specific attorney if he so wished.

Despite having been provided with specific information regarding his attorney's efforts to reach him and to stop all

---

[4]Contrary to the contention that the police "hid" the defendant from his attorneys, and thereby prevented them from communicating with him, the motion judge's findings suggest otherwise.

questioning, the defendant chose to continue with the polygraph examination and speak with the police. That waiver of his right to counsel was valid in the circumstances, as the defendant declined a specific offer of assistance by an identified attorney and he had sufficient information to make a voluntary, knowing, and intelligent waiver of his Miranda rights. See *Commonwealth* v. *Mavredakis, supra* at 861; *Commonwealth* v. *Currie, supra.*

To be sure, the duty to inform a suspect of an attorney's attempt to render assistance requires the police "to apprise the defendant of a specific communication from his attorney that bore directly on the right to counsel." *Commonwealth* v. *Mavredakis, supra* at 861, quoting *State* v. *Stoddard,* 206 Conn. 157, 169 (1988). In this regard, Lieutenant Gannon was obliged "immediately" to inform the defendant of Andrews's attempts to assist the defendant rather than contact the assistant district attorney, as he did. *Commonwealth* v. *Mavredakis, supra.* To the extent that he failed to do so, however, no admission or confession was obtained from the defendant in the interim. As such, any neglect in this regard was harmless beyond a reasonable doubt because it did not contribute in any way to the defendant's convictions. See *Commonwealth* v. *Curtis,* 417 Mass. 619, 635 (1994); *Commonwealth* v. *Perez,* 411 Mass. 249, 260 (1991).

Because the defendant's knowledge of an attorney's attempts to render assistance in the context of a Miranda waiver is 'the central issue here under art. 12, the parties' dispute as to whether the CPCS procedure for appointing attorneys was valid is irrelevant to the outcome of this case.[5] Formal appointment is not a predicate to the duty to inform a suspect of an attorney's efforts to render assistance. See *Commonwealth* v. *Sherman, supra* at 295 ("it would unduly elevate form over substance to hold that [the officer's] failure to inform the defendant [of an attorney's] request was not constitutionally significant because [the attorney] had not yet been appointed to represent the defendant in the instant cases"). Accordingly, we need not address the defendant's contention that under art. 30, the Commonwealth and the motion judge impermissibly invalidated the

---

[5]The motion judge concluded that CPCS's procedure for appointment of counsel for prearraignment procedures in murder cases did not include persons who did not request counsel.

CPCS appointment procedures. The motion judge found that, even if McGuire were the defendant's attorney, Consigli informed the defendant of McGuire's efforts to end the questioning and to speak with the defendant on behalf of Andrews. As such, the motion judge's decision did not rely on the fact that he considered the CPCS procedures to apply only to a defendant requesting counsel.

Finally, the defendant argues that the assistant district attorney assigned to the investigation violated Mass. R. Prof. C. 4.2 (formerly S.J.C. Rule 3:07, Canon 7, DR 7-104, as appearing in 382 Mass. 786 [1981]),[6] and that such a violation required suppression. This argument was first raised in the defendant's motion for a new trial. The defendant has failed to demonstrate why suppression is an appropriate remedy in this case for the alleged violation of an ethical rule. Cf. *Doe* v. *Nutter, McClennen & Fish*, 41 Mass. App. Ct. 137, 141 (1996), and cases cited (even if attorney violates rule precluding ex parte communication with represented party, violation did not create cause of action based solely on rules of professional conduct).

The defendant recognizes that a "violation of a rule of professional conduct is not necessarily grounds for reversal," but urges us "to apply a prophylactic exclusionary rule." There is no reason to do so in these circumstances, especially where, as here, there was no resulting prejudice to the defendant. Despite the assistant district attorney's directive to continue with the polygraph, Consigli, on his own initiative, informed the defendant that his attorneys did not want the polygraph to continue. The defendant nonetheless opted to continue with the polygraph.

2. *Voluntariness of Statements.*

(a) *Evidence of attorney's efforts.* At trial, the Commonwealth moved to exclude evidence of the efforts of counsel to reach the defendant and stop interrogation, claiming that such evidence

---

[6]Disciplinary Rule 7-104 (A) (1), in effect at the time, provided as follows: "(A) During the course of his representation of a client, a lawyer shall not: (1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so." S.J.C. Rule 3:07, Canon 7, DR 7-104, as appearing in 382 Mass. 786 (1981).

did not raise a factual issue concerning the voluntariness of the defendant's statement. Despite his reservations, the judge agreed that the defendant's waiver was a legal issue and allowed the motion. The defendant contends that, even if his statements were admissible, the judge erred in excluding evidence of the attorneys' efforts to reach him during his interrogation because such evidence was relevant to the issue of voluntariness, and the jury should have been permitted to consider it under the humane practice rule.

Under the humane practice rule, if the voluntariness of a statement becomes a live issue at trial, due process requires that the Commonwealth prove beyond a reasonable doubt that any statement was voluntary or the jury must disregard the statement. See *Commonwealth* v. *Tavares*, 385 Mass. 140, 152, cert. denied, 457 U.S. 1137 (1982). When determining if a statement is voluntary, the relevant inquiry is whether a defendant's will was overborne to the extent that his statement was not the result of a free and voluntary act. See *Commonwealth* v. *Selby*, 420 Mass. 656, 662-663 (1995).

We have rejected the argument that the jury must consider the voluntariness of the Miranda waiver when deciding whether a statement was voluntary under the due process clause, because waiver of Miranda rights presents a question of law for the motion judge. See *Commonwealth* v. *Todd*, 408 Mass. 724, 727 (1990); *Commonwealth* v. *Day*, 387 Mass. 915, 923 (1983). To the extent that the jury may consider Miranda issues in their over-all determination of voluntariness, see *Commonwealth* v. *Tavares*, *supra* at 153 n.19, it is enough that the jury be instructed to consider whether a defendant received the Miranda warnings when deciding, under the totality of the circumstances, if a statement made during custodial interrogation was voluntary. See *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986); *Commonwealth* v. *Nadworny*, 396 Mass. 342, 369 (1985), cert. denied, 477 Mass. 964 (1986).

The failure to inform a suspect of an attorney's attempts to render assistance goes solely to the legal question whether waiver of the Miranda rights is voluntary, knowing, and intelligent. See *Commonwealth* v. *Mavredakis*, *supra* at 859. See also *Commonwealth* v. *Phinney*, 416 Mass. 364, 372 n.5

(1993) (waiver "is not knowing" if police fail to inform defendant that attorney has requested to be present or fail to respond to attorney attempting to contact police in charge of investigation). Nothing in the *Mavredakis* case indicates that an attorney's attempts to render assistance affects the voluntariness of his statements. See *Moran* v. *Burbine*, 475 U.S. 412, 422 (1986); *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986). Rather, *Mavredakis* provided substantive meaning to Miranda protections by requiring that a suspect be given information deemed essential to make a knowing waiver of his right to counsel. See *Commonwealth* v. *Mavredakis, supra* at 856, 859-860. Our decision in *Mavredakis* did not depart from *Moran* v. *Burbine, supra,* where the Court held that voluntariness in terms of coercion was not at issue solely because the suspect was unaware of his or her attorney's efforts to render assistance. Rather, we disagreed with the Court's "assumption that information regarding the immediate availability of an attorney has no bearing on a suspect's ability knowingly and intelligently to waive Miranda rights." *Commonwealth* v. *Mavredakis, supra* at 859.

The defendant cites no authority for the proposition that failure to advise a defendant of an attorney's attempt to render assistance is relevant to the question of the voluntariness of a statement. The *Mavredakis* case and its predecessors addressed the consequences of failing to advise a defendant of his attorney's efforts of assistance in situations calling into question the knowing and intelligent aspects of a Miranda waiver. See *Commonwealth* v. *Mavredakis, supra* at 861-862; *Commonwealth* v. *Sherman,* 389 Mass. 287, 288-289, 295 (1983); *Commonwealth* v. *Mahnke,* 368 Mass. 662, 691-693 (1975); *Commonwealth* v. *McKenna,* 355 Mass. 313, 317-320 (1969). In *Commonwealth* v. *Mahnke, supra* at 692-693, we said that, if statements were inadmissible because the police violated the Miranda safeguards by failing to inform the suspect of his attorney's efforts to speak with him, the statements, "if voluntary and trustworthy," were available to impeach the defendant's testimony if he took the stand. Markedly absent from the separate discussion of voluntariness is any reference to counsel's efforts in that case to reach the defendant as being a factor in

the determination of voluntariness of the statements. *Id.* at 697-700.

There was no error in allowing the Commonwealth's motion in limine, because the excluded evidence, although relevant to the legal question whether the defendant knowingly and intelligently waived his Miranda rights, was irrelevant to the question of the voluntariness of his statement.

(b) *Expert testimony*. The defendant argues that it was error to exclude opinion testimony from his psychologist that went to the ultimate question of his capacity to make a voluntary, knowing, and intelligent waiver of his Miranda rights, and to give a voluntary statement.[7] As discussed in Part 2(a), waiver of Miranda rights is a question of law for the judge to decide; it is not a question for the jury. There was no error, therefore, in the exclusion of expert testimony on the subject of waiver of Miranda rights.

The judge also excluded opinion testimony that the defendant lacked capacity to give a voluntary statement. That decision "rests in the broad discretion of the judge and will not be disturbed unless the exercise of that discretion constitutes an abuse of discretion or error of law." *Commonwealth* v. *Pike*, 430 Mass. 317, 324 (1999). "[A] question calling for an opinion which is in the domain of the expert's professional knowledge is not necessarily to be excluded merely because the expert's conclusion reaches or approaches the ultimate issue before the jury." *Commonwealth* v. *Colin C.*, 419 Mass. 54, 59 (1994). The defendant's reliance on *Commonwealth* v. *Crawford*, 429 Mass. 60, 66 (1999), is misplaced. In that case the judge excluded all testimony of battered woman syndrome as it related to the voluntariness of the defendant's statements. Here, the defendant's expert was permitted to testify that the defendant's ability to "rationally think through what decision he should make would be impaired" by police questioning, and further impaired by the effects of any drugs or alcohol he had consumed. The excluded testimony was offered during redirect examination. It would not have appreciably enhanced or added to the testimony given on direct examination. There was no

---

[7] The defendant made an offer of proof that the witness, if permitted, would testify that the defendant lacked capacity to make a voluntary waiver of rights.

abuse of discretion in the exclusion of testimony, the import of which had previously been admitted.

3. *Assistance of Counsel.*

The defendant claims that trial counsel's strategy in presenting expert testimony of the defendant's state of mind at the time of the crimes constituted ineffective assistance of counsel because, in doing so, he abandoned the defense of identity and thereby foreclosed any possibility of an acquittal of felony-murder.

We review the defendant's claim of ineffective assistance of counsel under G. L. c. 278, § 33E, which provides a standard of review more favorable than the constitutional standard of review of such claims. See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). Under this standard of review, however, tactical decisions of counsel will not be deemed ineffective unless manifestly unreasonable when made. See *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998).

Identity was not the critical issue the defendant now suggests. Not only was the circumstantial case against the defendant strong, but the defendant ignores his confession to strangling Anmorian Or. Trial counsel's strategy to pursue psychiatric evidence to create a reasonable doubt as to the defendant's capacity deliberately to premeditate and to formulate the intent to kill was not manifestly unreasonable, particularly because it was the only evidence that could be viewed as favorable to the defendant, even casting him in a somewhat sympathetic light. As the judge incisively noted in his memorandum and order on the defendant's motion for a new trial, "There was overwhelming evidence as to the defendant's identity as the perpetrator of this crime. . . . The identity defense, while perhaps a possible defense, was not a substantial defense." If there was a weakness in the defense, it was not for want of accomplished lawyering, but for want of any promising defense. The defendant has failed to show that counsel's efforts created a substantial likelihood of a miscarriage of justice.

4. *G. L. c. 278, § 33E.*

We have reviewed the entire record, the briefs, and the arguments of counsel. We see no reason to exercise our power under

G. L. c. 278, § 33E, to reduce the murder conviction or order a new trial. However, the separate convictions of rape of a child by force, and kidnapping, are lesser included offenses of felony murder. One of the offenses may be dismissed as duplicative. Because the Commonwealth is entitled to a verdict on the highest crime charged, the kidnapping conviction must be vacated and that indictment dismissed. See *Commonwealth v. Doucette*, 430 Mass. 461, 471 (1999); *Commonwealth v. Wade*, 428 Mass. 147, 155 (1998). See also *Commonwealth v. O'Brien*, 432 Mass. 578, 591 (2000). Cf. *Commonwealth v. Jackson*, 428 Mass. 455, 467 (1998).

5. The conviction and sentence of the defendant on the indictment charging him with kidnapping is vacated, the verdict is set aside, and the indictment dismissed. The convictions of felony murder in the first degree and rape of a child by force are affirmed. The order denying the defendant's motion for a new trial is affirmed.

*So ordered.*