## Commonwealth vs. Frank P. LeBeau, Jr.

Berkshire. March 7, 2008. - April 22, 2008.

Present: Greaney, Ireland, Cordy, & Botsford, JJ.

*Homicide. Larceny. Practice, Criminal,* Capital case, Voluntariness of statement, Duplicative convictions. *Due Process of Law,* Police custody. *Intoxication. Search and Seizure,* Consent. *Evidence,* Prior misconduct, Relevancy and materiality.

A Superior Court judge properly denied the criminal defendant's motion to suppress a statement he made to police, where the defendant's waiver of his Miranda rights was voluntary, knowing, and intelligent, and his statement was otherwise voluntary [254-255]; where the defendant was sober and was not suffering from sleep deprivation or any other physical or mental problems [255-256]; and where the defendant was not deprived of his right to use the telephone [256-258].

At a criminal trial, the judge did not err in admitting in evidence a consent to search form that the defendant had signed at the police barracks, where the defendant voluntarily accompanied police officers to the barracks and expressed a willingness to do whatever he had to do to clear his name, and where it was clear from the record that the defendant knew he could refuse to consent. [258-260]

At a criminal trial, the judge did not abuse his discretion in admitting in evidence certain testimony regarding the defendant's prior bad acts, where the evidence was probative of the defendant's state of mind, and where the judge instructed the jury as to the use of such evidence. [260-261]

This court declined to exercise its authority under G. L. c. 278, § 33E, to set aside or reduce a verdict of murder in the first degree, where the jury were properly instructed on the issue of intoxication as a mitigating factor, and where the jury's verdict demonstrated that they found to be present beyond a reasonable doubt one or more of the seven factors required to convict on the theory of extreme atrocity or cruelty. [261-262]

Three of a criminal defendant's four convictions of larceny were duplicative, where there was but one incident of taking from the victim, at a single time and at a single place. [262-263]

Indictments found and returned in the Superior Court Department on September 20, 2002.

A pretrial motion to suppress evidence was heard by *John A. Agostini*, J., and the cases were tried before him.

*Chauncey B. Wood* for the defendant.

*David F. Capeless*, District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty, three charges of larceny over $250, and one charge of larceny under $250. Represented by new counsel on appeal, the defendant claims error in the denial of his motion to suppress his statements (including his confession to the murder of the victim, Robert Vincent) given to Pittsfield police officers and in the admission of certain evidence (including the contents of his wallet) at trial. The defendant also asserts that the totality of the evidence, including evidence of the defendant's intoxication on the night of the killing, requires that we use our authority under G. L. c. 278, § 33E, to reduce his murder conviction to murder in the second degree or manslaughter. We decline to do so. We agree with the defendant, however, that, in the circumstances of this case, his convictions of four separate charges of larceny, for conduct which was, in actuality, one single criminal scheme, cannot stand. Accordingly, we affirm the judgment of conviction of murder and one judgment of conviction of larceny over $250, but vacate the other three judgments of conviction of larceny. We remand the case to the Superior Court for dismissal of three indictments charging larceny, and for reconsideration of the sentence imposed (and resentencing, if appropriate) on the remaining larceny conviction.

1. The jury could have found the following facts. At the time of his death, the victim lived in a one-room apartment on Tyler Street in Pittsfield. He was sixty-two years old. He had been employed by Tyler Home Supply since he was a young man and, for years, had been the store manager. One of his job responsibilities was to open the store for business in the morning, a task he performed, on time, every day. A man of habit, at the end of each work day, the victim would walk a short distance up Tyler Street to the Tyler Café (a local bar also known as Charlie's) to have a few beers and play the game Keno, before walking home for the evening. Although he generally was regarded as a private person, the victim had many good friends at the bar.

On Friday, August 16, 2002, as was his custom, the victim opened Tyler Home Supply at 8 A.M., and, following his day of work, walked to the bar and played Keno for the rest of the afternoon. He always played the same numbers: 4, 9, 19, 39, 62; or 1, 10, 22, 80. That afternoon, the victim's numbers came up on the Keno board and he won $473. He bought a round of drinks for everyone present, tipped the bartender ten dollars and tipped the Keno operator forty-eight dollars. After this show of generosity, the victim was left with $400. Prior to leaving the bar for home at approximately 4:30 P.M., the victim purchased three more Keno tickets. Customers at the bar continued to speak about the victim's winning that afternoon and into the evening.

The defendant frequented the Tyler Café regularly after moving to Pittsfield from Great Barrington in the summer of 2002. He was living in August in a two-bedroom apartment on Maplewood Avenue with a friend, Beverly Besanceney. The defendant was unemployed and in need of money.

On August 16, the defendant arrived at the bar a few hours after the victim had left. He drank several rum and coke cocktails throughout the evening, leaving the bar for about thirty minutes sometime between the hours of 9 P.M. and 11 P.M. Portions of a videotape recording taken in the bar between 1 A.M. and 2:45 A.M. on August 17, show the defendant, one of only two customers remaining, helping a female bartender clean off tables at closing time.

Sometime during the early hours of August 17, the defendant entered the victim's apartment and bludgeoned him to death with a foam-covered steel exercise bar. The defendant then rolled the body off the couch (where, a jury could find, the victim had been sleeping), rummaged behind the sofa cushions (possibly looking for items of value), and replaced the cushions (reversing the order in which he had found them) before fleeing the scene. The defendant took from the apartment three Keno playing cards, two rings,[1] and approximately $400 in cash.

When the victim failed to open Tyler Home Supply the fol-

---

[1]The victim was known to own two rings. One was a gold and diamond ring, and the other, a ring the victim had been awarded when named Elk of the Year for his service to Elks Lodge No. 272. The record indicates that, at the time of trial, neither ring had been found by police.

lowing morning, store employees were immediately alarmed, because he had never before not shown up for work without a reason. Two employees went to knock on the victim's apartment door, and hearing no response, they notified the Pittsfield police department. The two employees then entered the one-room apartment through the back door (which, they knew, had a cardboard square taped over one window pane that was missing its glass) and, once inside the darkened apartment, discovered the victim's body on the floor wrapped in a comforter. They immediately left the apartment, and police officers arrived at the scene minutes thereafter.

The medical examiner testified at trial that the victim's skull had been shattered by multiple blows of a blunt object delivered with "a great deal of force." A pillow on the couch was saturated with blood and bits of human tissue. A chemist for the State police testified that the pattern of blood stains and blood spatter in the room indicated that the victim's head was on the right hand seat cushion of the sofa when the "bloodshed began." There were no defensive wounds on the victim, and the soles of his feet were clean.

During the days that followed, Pittsfield police officers attempted to interview everyone known to have been present at the bar on August 16. Their investigation disclosed that the defendant had been in the bar on Friday night and into Saturday morning. Further investigation revealed that the defendant had returned to Besanceney's apartment in the early hours of Saturday morning, shirtless and sockless; had acted strangely throughout the day; and had left Pittsfield, with most of his belongings, on Saturday evening.[2] Police later learned that the defendant

---

[2]Beverly Besanceney and three others who were sharing her apartment at the time of the murder testified to the following story. The defendant had left the apartment on the evening of August 16 to go out for a drink. The next morning at 4:30 A.M., Besanceney and her boy friend were awakened by the defendant's throwing pebbles at their window. They let him into the apartment and noticed that he was not wearing a shirt or socks (although he had been wearing both when he left the previous evening) and he was sweating and out of breath. Besanceney and the others observed that the defendant appeared agitated and spent an unusual amount of time staring at, or examining, his boots. Later that day, the defendant packed up most of his possessions and began contacting friends by telephone in an effort to get a ride out of town. He was picked up from the Maplewood Avenue apartment by someone driv-

(who owned no car) got a ride out of town with a friend, Mark Shar, who drove the defendant to Shar's home in Agawam. The next day, Shar drove the defendant to the home of another friend, Kevin Bradley, at 21 Little Alum Road in Brimfield.

On the night of Tuesday, August 20, Officer Glen Decker and Detective Thomas Bowler, of the Pittsfield police department, accompanied by Lieutenant Richard M. Smith of the State police, proceeded to Brimfield to interview the defendant. They were in plain clothes and their police cruiser was unmarked. They wore visible badges and each was armed. At approximately 11:20 P.M. that evening, the officers were traveling down Little Alum Road when they encountered a lone male, standing by the roadside. The man had a beer in one hand and, with the other, appeared to be speaking on a cellular telephone. Detective Decker said, "That's our man." Lieutenant Smith stopped the cruiser and, through the open window, said to the defendant, "Hi, Frank LeBeau, could I talk with you for a minute?"

Over the next ten hours (the details of which will be set forth in connection with our discussion of the suppression issues), the defendant gave two widely differing statements to the officers at the Sturbridge State police barracks. In the first, the defendant gave a detailed account of his whereabouts on August 16-17, but denied knowing the victim, denied being at the Tyler Café on Friday evening, and denied ever having been in the victim's apartment. In the second, the defendant confessed to the killing and apologized to the victim's family. A search of the defendant's wallet revealed the three Keno tickets that the victim had purchased at the Tyler Café on the previous Friday night. One fingerprint found in the victim's apartment matched that of the defendant. Some of the defendant's clothing discovered in a storage shed on Bradley's property tested positively for human blood that, deoxyribonucleic acid (DNA) tests confirmed, bore the victim's DNA profile.

2. The defendant moved to suppress the statements he made to police. The testimony presented at an evidentiary hearing on the defendant's motion focused on events that occurred in the ten hours between 11:20 P.M. on August 20, when the officers

ing a black Nissan Pathfinder vehicle at approximately 7 P.M. Besanceney and her friends did not hear of the defendant again until after his arrest.

first encountered the defendant on Little Alum Road, and 9:35 A.M. on August 21, when the defendant was formally arrested at the Sturbridge State police barracks. (Virtually identical testimony was later presented at trial.) The judge (the same judge who presided at trial) denied the defendant's motion. We now summarize the judge's findings, all which are fully supported in the record.

a. After encountering the defendant on Little Alum Road, the officers stepped out of their vehicle and introduced themselves. They explained that they were investigating a murder that had occurred in Pittsfield and were interviewing everyone who had been in the Tyler Café on the previous Friday. They asked the defendant if he would go with them to the Sturbridge State police barracks to be interviewed. The defendant agreed to be interviewed, but asked whether the interview had to be done that night. Lieutenant Smith responded that this was a serious case, they had traveled a significant distance, and they would like to get the statement that evening. The defendant voluntarily agreed to go with them, and walked inside the house to tell his friend, Kevin Bradley, that he would be going to the police barracks. Because the defendant was holding a beer can, Lieutenant Smith inquired as to how much the defendant had had to drink that evening. Although the defendant stated that he had consumed from five to eight beers since 5 P.M., there was no evidence that the defendant was affected by his consumption of alcohol. The officers did not notice any odor of alcohol on the defendant. The defendant appeared sober, spoke clearly, and had no difficulty understanding the purpose of the visit. Although it was quite dark, the defendant easily navigated the narrow forty-foot gravel path that sloped down to Bradley's house, including four steps, with little or no lighting.

The defendant entered the house and disappeared from the officers' view. The officers decided to follow. They knocked on the door, and Bradley invited them in. Lieutenant Smith explained to Bradley that the defendant was not under arrest, but had voluntarily agreed to go with them to the barracks to be interviewed. Lieutenant Smith then summoned a cruiser to transport the defendant, Detective Decker, and Officer Bowler to the Sturbridge barracks. Lieutenant Smith returned inside and took

Bradley's statement. By counting the beer cans left in the refrigerator, Bradley determined that the defendant had consumed only four beers that evening.[3] Bradley indicated that a wallet lying on the kitchen table belonged to the defendant.

The Sturbridge barracks was a little less than five miles from Bradley's house. At the barracks (after stopping once on the way to purchase coffee for the defendant), the officers and the defendant proceeded to a conference room on the second floor. The defendant again was informed that he was not under arrest and was free to leave at any time. The defendant was told that the police were interviewing everyone who had been at the bar on Friday evening, and that someone had seen him there that night. The defendant retorted that it would be "my word versus his word."

The defendant was calm, cooperative, and confident when he provided the officers with his first written statement.[4] The defendant had a specific memory of his activities during the day of the murder and provided the police with a great deal of information. He understood the questions, was quick to answer, expressed himself clearly, and even assisted the officers in the spelling of names and words.

On completing his first statement, he asked to have a cigarette. Detective Decker explained to the defendant that it was a smoke-free building, and the defendant responded, "I'm not under arrest so I can just go outside." Detective Decker agreed and stated, "Absolutely, you can leave any time you want."

The defendant went outside the building, unaccompanied, to smoke on four different occasions during that time. The defendant was not restrained in any way, nor was he followed or observed during the times that he was outside the conference room. Officer Bowler and Detective Decker were polite and accommodating at all times. They made it clear to the defendant that he was not under arrest, he was being asked to answer certain questions voluntarily, and he could leave at anytime. The judge determined, beyond a reasonable doubt, that when the defendant

---

[3]The judge made an express finding that this was a more credible account of the number of beers consumed by the defendant during the evening of August 20, 2002.

[4]The interviewing process began at 11:52 P.M. and concluded at 2:45 A.M.

voluntarily made his first statement, he was not in custody and no Miranda warnings were necessary.

After a break, the officers asked the defendant whether they could have his pants and boots for laboratory testing. The defendant demurred, stating that he had no other pants or boots to wear to work. A compromise was agreed to in which the officers would take photographs of the defendant's pants and boots and ink impression of the soles of the boots. The defendant also was asked for permission to search his personal belongings at Bradley's house, including his wallet. He initially agreed, but then told the officers that there was a small amount of marijuana in his things at Bradley's house. He expressed concern that he might be arrested for the marijuana and was worried as well that Bradley would be angry with the defendant, who had given Bradley his word that he was drug free. The officers assured the defendant that no arrest would be made for possession of marijuana and that every effort would be made to conceal the marijuana from Bradley. The defendant agreed and signed a "consent to search" form that had been provided by the State police.[5]

The officers then made ink impressions of the defendant's boots. The defendant was asked, and agreed, to provide a DNA sample. Detective Decker then photographed the defendant's body, with and without his shirt. In one photograph the defendant appeared to be laughing. The officers thanked the defendant for his cooperation, and the defendant stated that he was willing to do whatever he had to do to clear his name.

At approximately 4:40 A.M., a copy of the defendant's signed consent to search form in hand, Lieutenant Smith initiated a search of the defendant's belongings at Bradley's home. In the defendant's wallet, among other things, Lieutenant Smith found three Keno tickets. The significance of the Keno tickets was immediately apparent to Lieutenant Smith. Information on their discovery was relayed back to officers at the Pittsfield police station, who advised Lieutenant Smith to stop the search because an application for a search warrant for Bradley's house was being prepared.

---

[5]The record shows that the defendant signed the consent to search form at 3:50 A.M.

Shortly before 5 A.M., Detective Decker thanked the defendant for his cooperation and informed him there was nothing more he needed to do. Detective Decker then told the defendant that he wanted to share with him some additional information, but, first, he needed to advise the defendant of his Miranda rights. Detective Decker read the rights, one by one, from a form obtained earlier that evening from the Pittsfield police department, asked the defendant whether he understood each right, and had the defendant read the rights himself. The defendant then signed the bottom of the form, indicating that he had read and understood his rights. The defendant also signed a waiver of those rights. The warning form and waiver form were signed at 4:55 A.M. and 4:56 A.M., respectively.

The tone of the conversation changed somewhat and became "slightly more ominous." The defendant (who had previously been confident to the point of "cockiness") appeared to listen more carefully and respond to the officers' questions more deliberately. The defendant was told that the police had him on videotape at the bar on Friday night and that his friends in Pittsfield had expressed certain concerns with his appearance and actions taken on early Saturday morning. When Officer Bowler confronted the defendant with the stolen Keno tickets, the defendant became extremely quiet. He stared at the tickets, and, after a few minutes, said, "I'm fucked." After another period of silence, the defendant said, "You guys must really hate me." There followed more periods of silence, broken by intermittent comments made by the defendant, and responses to the defendant's comments made by the officers.[6] Officer Bowler told

[6]Detective Decker assured the defendant that they did not hate him, but said they would think more of him if he had a conscience. He told the defendant that this was his chance to tell what happened and how he felt. The defendant asked what would it matter, because he would be spending the rest of his life in prison. He asked the officers whether it would be State or Federal prison. Officer Bowler responded, "State." The defendant stated that he had a big decision to make. The officers agreed and allowed the defendant time to think. The defendant made other statements of similar ilk, to which the officers responded in calm tones. Detective Decker then asked the defendant whether he wished the incident never had happened. The defendant nodded. Detective Decker asked the defendant whether he felt bad for what he had done to the victim, and the defendant nodded. He asked the defendant if he were remorseful. Again, the defendant nodded. The defendant suggested that maybe he "should

the defendant that he saw a little devil on one of his shoulders, and a little angel on the other, and asked the defendant which one he would like him "to knock off." The defendant replied, "The one in the middle." At this point, the police considered the defendant to be in custody and believed they had probable cause for his arrest.

At approximately 6:30 A.M., Lieutenant Smith returned to the Sturbridge barracks after completing a search of Bradley's home. Lieutenant Smith discussed the defendant's situation with Officer Bowler and was told that "he hadn't got there yet," meaning (the judge understood) that the defendant had not yet made a confession. Lieutenant Smith entered the conference room and sat down across from the defendant. He told the defendant that his friends, Shar and Bradley, could not believe he was involved with such a brutal incident and that it was his chance to tell his side of the story.[7] Lieutenant Smith said to the defendant, "Look at me . . . did you kill that man?" The defendant indicated that he would speak with Officer Bowler and Detective Decker. Lieutenant Smith left the room. The defendant began to cry.

At 7:14 A.M., Officer Bowler and Detective Decker began to take the defendant's second statement. The defendant recounted details of the events that, according to the defendant, led to the victim's death.[8] After reviewing what had been written, the defendant indicated his desire to add an apology to the victim's family. The defendant signed the completed statement at 9:15 A.M.

just gamble, like O.J. Simpson did." Detective Decker told the defendant that he was not O.J. Simpson and that O.J. Simpson did not have three Keno tickets belonging to the victim in his wallet. The defendant agreed.

[7]Lieutenant Smith told the defendant that everyone makes mistakes, and that this was the time to provide "a big piece of the puzzle." He told the defendant that the physical evidence at the crime scene indicated that the victim's death was a "violent and brutal crime" committed by "some monster," and that the defendant could tell "what if anything [had] happened . . . inside the apartment."

[8]In his second statement, the defendant stated that he had gone to the victim's apartment after a night of heavy drinking at the bar. The victim had invited him in and had offered to let him sleep there. According to the defendant, the victim had gone into the bathroom and emerged with no clothes on. When the victim attempted to touch the defendant's genital area, the defendant asserted in his statement, he lost control, hit the victim, and ran out of the apartment. He stated that he did not know that he had killed the victim until the next day.

At 9:35 A.M., Lieutenant Smith formally arrested the defendant for the murder of Robert Vincent. The defendant was advised of what would happen next, including his transportation to the Pittsfield police station, his booking, and his arraignment. At that time Lieutenant Smith also advised the defendant of his statutory right to a telephone call, pursuant to G. L. c. 276, § 33A. Although the defendant first appeared not to wish to exercise this right, with Detective Decker's encouragement, he made contact with his two friends, Shar and Bradley.[9] While in the process of being transported to Pittsfield, the defendant thanked both Officer Bowler and Detective Decker twice.

b. The defendant maintains that his second statement to the police should have been suppressed on three separate grounds: he was in custody at the time and he did not knowingly waive his Miranda rights; his statements were involuntary under a totality of circumstances analysis; and police officers intentionally withheld from him his statutory right to use the telephone, in violation of G. L. c. 276, § 33A.[10] We consider each argument in turn.

(i) "In reviewing the judge's decision, we 'give[] substantial deference to the judge's ultimate findings and conclusions of law, but independently review[] the correctness of the judge's application of constitutional principles to the facts found.' " *Commonwealth* v. *Morse*, 427 Mass. 117, 122 (1998), quoting *Commonwealth* v. *Magee*, 423 Mass. 381, 384 (1996). The judge correctly concluded that the defendant was in custody, for purposes of the Miranda warnings, at the time he gave his second statement to police.[11] Because the defendant was advised of, and waived, his Miranda rights, the issue becomes whether the

[9]Overheard portions of each telephone conversation suggest that the defendant told both friends that he was going to Pittsfield. The defendant stated to Bradley that he was "sorry," and told Shar that he had made "a mistake."

[10]The defendant appears to advance the same arguments in connection with his first statement, which concluded at 2:45 A.M. on August 21. The motion judge's conclusion that the defendant voluntarily made his first statement and was not in custody at that time is amply supported in the record, leaving no basis to suppress that statement.

[11]"This court has set forth four indicia of custody: (1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that the person is a suspect; (3) the nature of the interrogation, i.e., whether the interview was aggressive or, instead, informal;

Commonwealth has proved, by a totality of the circumstances, that the defendant made a voluntary, knowing, and intelligent waiver of his rights, and that his statements were otherwise voluntary. See *Commonwealth* v. *Jackson*, 432 Mass. 82, 85 (2000); *Commonwealth* v. *Edwards*, 420 Mass. 666, 669-670 (1995). See also *Commonwealth* v. *Medeiros*, 395 Mass. 336, 343 (1985) (although voluntariness of Miranda waiver and voluntariness of statement are distinct inquiries, totality of the circumstances test under each analysis is same).

The judge found beyond a reasonable doubt that the warnings were properly given to the defendant and that the defendant understood them. The judge further found, beyond a reasonable doubt, that the defendant had knowingly, intelligently, and voluntarily waived his Miranda rights. We reject the defendant's contentions that the judge erred in concluding that the Commonwealth sustained its burden of proving that the defendant's waiver was voluntary. The judge fully explained the basis for his conclusion and the conclusion is supported by the testimony at the hearing.

(ii) The judge found, beyond a reasonable doubt, that the defendant was sober and was not suffering from sleep deprivation[12] or any other physical or mental problems, and thus was

and (4) whether, at the time the incriminating statement or statements were made, the suspect was free to end the interview by leaving the place of the interrogation or by asking the interrogator to leave, or, alternatively, whether the interview terminated with the defendant's arrest." *Commonwealth* v. *Sneed*, 440 Mass. 216, 220 (2003), citing *Commonwealth* v. *Groome*, 435 Mass. 201, 212 & n.13 (2001). The relevant inquiry is "how a reasonable [person] in the [defendant's] position would have understood his situation." *Berkemer* v. *McCarty*, 468 U.S. 420, 442 (1984). See *Commonwealth* v. *Damiano*, 422 Mass. 10, 13 (1996). This analytical framework is easily applied to the hours between 7:14 A.M. and 9:15 A.M. on August 21, 2002, when the defendant made his second statement. There can be no doubt that, however polite the demeanor of the officers, and whatever the defendant's original perception of the nature of his interview, the display of the Keno tickets stolen from the victim's apartment would have immediately conveyed to the defendant the fact that he was, at that time, a prime suspect in the murder. The record also indicates that, as of that point in time, the defendant no longer was allowed to leave the building to smoke or to go to the bathroom unaccompanied.

[12]The defendant challenges this finding as clearly erroneous. The defendant remained at the Sturbridge barracks from approximately midnight until 7:15 A.M., with no sleep, before providing his second statement to police. There is no evidence, however, that the defendant ever indicated to the offi-

able to give voluntary statements to the police. The judge further found that the defendant's overt cooperation with the police was, in essence, "an offensive weapon to ensure that he would not be viewed as a suspect, or as he often stated, 'to clear his name.' " The judge determined that the defendant "knew precisely what he was doing when he made the challenged statements, and under the totality of the circumstances in the case, there is no evidence that any of the defendant's statements to the police were involuntary." The judge properly concluded, beyond a reasonable doubt, that the defendant made his statement voluntarily after a knowing and intelligent waiver of his Miranda rights.[13]

(iii) We now consider the defendant's assertion that his second statement should have been suppressed because he was held in custody for four hours at the Sturbridge barracks, when police knew they had probable cause to arrest him, in violation of his statutory right to use the telephone. General Laws c. 276, § 33A, set forth in the margin,[14] requires that a person under arrest be advised of this right at the time he arrives at the police station,

---

cers that he was tired, or otherwise physically uncomfortable, or asked the officers to take a break so that he could sleep or return to Bradley's house. Moreover, the judge expressly credited the officers' testimony that they did not observe any sign of intoxication or other mental incapacity that would have undermined the defendant's ability to provide a voluntary statement.

[13]We add that unchallenged testimony at trial supports a conclusion that, during the entire time that the defendant was in the Sturbridge barracks, he never complained, never brought up the topic of an attorney, and never indicated that he wanted to leave. His only requests — for cigarettes, use of the bathroom, and for water — were granted. Moreover, as has been mentioned above, the defendant repeatedly stated to police that he would do whatever he needed to do to clear his name. Lieutenant Smith's statement that the murder appeared to be "a violent and brutal crime committed by some monster" and that the defendant should "tell us his side of the story" cannot fairly be characterized as coercion that would require suppression. See *Commonwealth* v. *Meehan*, 377 Mass. 552, 564 (1979), cert. dismissed, 445 U.S. 39 (1980), and cases cited. See also *Commonwealth* v. *Souza*, 428 Mass. 478, 481-482 (1998).

[14]"The police official in charge of the station or other place of detention having a telephone wherein a person is held in custody, shall permit the use of the telephone, at the expense of the arrested person, for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney. Any such person shall be informed forthwith upon his arrival at such station or place of detention, of his right to so use the telephone, and such use shall be permitted within one hour thereafter." G. L. c. 276, § 33A.

and that he be afforded an opportunity to make a telephone call within one hour thereafter. As reasoned by the judge, the statute's notification requirement is part of the initial booking process that takes place when an individual who has been arrested is brought to the police station in custody. We have made clear that any statement obtained as a result of the intentional deprivation of a defendant's right to make a telephone call must be suppressed. See *Commonwealth* v. *Alicea*, 428 Mass. 711, 715-716 (1999).

Here, the police advised the defendant of his Miranda rights at approximately 5 A.M., when their inquiry began sharply to focus on inconsistencies in the defendant's story. Soon thereafter, the defendant was shown the stolen Keno tickets, and at that point (the Commonwealth concedes), the defendant was not only "in custody" for purposes of Miranda, but the police had probable cause to arrest him. The defendant was advised of his statutory right to make a telephone call (and, with encouragement, made two) within minutes of his formal arrest at the Sturbridge barracks. In the circumstances of this case, that was enough. We need not decide whether the statute requires that an individual, not in custody, who has arrived at a police station must be advised of his telephone rights within one hour of the time police have probable cause to arrest (as the defendant appears to argue), or merely within one hour of the time his formal arrest takes place (as the Commonwealth maintains), because we conclude that the statute was complied with. We do not read the statute to impose an obligation on the part of police to interrupt a voluntary interview once probable cause to arrest is established, but before the interview has ended, to notify a suspect of his statutory telephone rights.

The remedy of suppression is available only if police intentionally deprive a defendant of his right under § 33A. See *Commonwealth* v. *Jackson*, 447 Mass. 603, 615 (2006); *Commonwealth* v. *Alicea*, *supra* at 716 (exclusionary rule applies if "intentional police misconduct deprives a defendant of the statutory right"). Compare *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 266 (1982) (suppression not appropriate where evidence insufficient to support intentional deprivation of telephone), with *Commonwealth* v. *Jones*, 362 Mass. 497, 503 (1972) (sup-

pression appropriate where police intentionally prevented defendant from making telephone call). The defendant bears the burden of establishing an intentional violation of the statute. See *Commonwealth* v. *Scoggins*, 439 Mass. 571, 578 (2003). He has not done so.

Although the defendant maintains otherwise, there is no evidence in the record that he "remained silent [from 5:30 A.M. until 7:15 A.M.] as the police repeatedly pressured him to confess." There were, in fact, short periods of silence in which Officer Bowler and Detective Decker allowed the defendant time to deliberate on the choice he had to make, but no lengthy, unbroken, periods of silence by the defendant, nor any "badger-[ing]" on the part of the officers. See notes 6 and 7, *supra*. The defendant had been advised of, and waived, his Miranda rights, which included his constitutional right to remain silent and to obtain (or be provided with) an attorney. There is no basis to conclude that the defendant was unaware that he could choose not to speak to the police at any time. The defendant's assertion that the officers intentionally delayed the moment of arrest because, had the defendant been confronted with the reality of his arrest for murder, he might have called an attorney (who would have advised him to remain silent), is a theory with no support in the record.

3. The signed consent to search form was admitted at trial over a defense objection on the ground that "the appropriate constitutional safeguards were not applied." The defendant's trial counsel also objected to the introduction of the contents of the wallet because the search of the wallet "was in fact illegal." The defendant now contends that the Keno tickets found in his wallet were inadmissible because his consent to the search of his wallet was not freely or voluntarily given. This issue was not seasonably raised, however, in a pretrial motion to suppress the Keno tickets, under Rule 61 of the Rules of the Superior Court (2008), and the defendant's motion to suppress his statements did not assert the argument that his second statement was a direct consequence of the discovery of the Keno tickets and, therefore, inadmissible as fruit of the poisonous tree. We thus review the defendant's claim under the statutory standard set forth in G. L. c. 278, § 33E, that is, whether there was error during trial (by defense counsel, the prosecutor, or the judge)

and, if so, whether the error could have resulted in a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright,* 411 Mass. 678, 681-682 (1992). See also *Commonwealth* v. *Novo,* 449 Mass. 84, 96 (2007).[15] There was no error.

We have recognized that a signature obtained on a consent to search form, in circumstances when the target of the search is confronted by uniformed police officers, or held in a police station, and is unaware of his right to refuse consent, must be considered suspect. See *Commonwealth* v. *Rogers,* 444 Mass. 234, 241-242 (2005). For that reason, the Commonwealth must prove "consent unfettered by coercion, express or implied," *Commonwealth* v. *Sanna,* 424 Mass. 92, 97 (1997), quoting *Commonwealth* v. *Voisine,* 414 Mass. 772, 783 (1993), and more than "simple resignation to the perceived power of [law enforcement] officials. *Commonwealth* v. *Rogers, supra* at 238.

Here, the defendant voluntarily accompanied the officers to the Sturbridge barracks and explained several times throughout the evening (as found by the judge after the motion to suppress hearing, and as paraphrased in testimony at trial) that he was willing to do whatever he had to do "to clear his name." The defendant displayed an attitude of cooperation throughout the evening, at least until the time he was confronted with the stolen Keno tickets. See *Commonwealth* v. *Aguiar,* 370 Mass. 490, 496-497 (1976), and cases cited. "His voluntary cooperation prior to arrest cannot furnish a basis for suppressing physical evidence acquired by the police." *Commonwealth* v. *Eagles,* 419 Mass. 825, 833 (1995).

Moreover, it is clear from the record that the defendant knew that he could refuse to consent: indeed, before he agreed to

[15]The defendant submits that his trial counsel was ineffective to the extent that his failure to file an appropriate motion prior to trial should result in this court now rejecting the claim that his consent was involuntary. We review this claim under the same statutory standard applied above. See *Commonwealth* v. *Wright,* 411 Mass. 678, 681-682 (1992) (in capital cases, ineffective assistance of counsel claims are reviewed under standard set forth in G. L. c. 278, § 33E, whether serious failure on part of trial counsel resulted in substantial likelihood of miscarriage of justice). See also *Commonwealth* v. *Novo,* 449 Mass. 84, 96 (2007). Based on the record before us, we are confident that any pretrial motion to suppress the Keno tickets would have been denied. Trial counsel cannot be deemed ineffective when there has been no error.

consent to the search, he consciously bargained with the officers for a promise that no negative consequences would befall him on the inevitable discovery of his stash of marijuana. Presumably, the presence of the victim's Keno tickets in his wallet (which also would inevitably be discovered by police) had slipped the defendant's mind.[16]

4. The defendant asserts that the judge committed reversible error when he denied a series of defense motions to exclude evidence that was irrelevant and highly prejudicial and, thus, which undermined the integrity of the verdicts. The defendant points to the following portions of testimonial evidence that, he argues, should not have been admitted:

> (1) The bartender at the Tyler Café testified that, on the night of the murder, the defendant flirted with her and lifted up his shirt to show off his physique.

> (2) The mother of the defendant's child testified that, at the time of the murder, the defendant had been ordered to pay her $25,000 for child support.

> (3) A former friend testified that, in early August, 2002, the defendant had stolen a one hundred dollar bill from her after spending the night at her apartment.[17] She further testified that she had filed an application for a criminal complaint against the defendant, and the clerk had advised the defendant that, to avoid criminal charges, he should repay the money by August 26. She testified that she received in the mail a money order for one hundred dollars, dated August 20, from the defendant.

Evidence of prior bad acts, of course, may not be introduced for the purpose of showing the accused's propensity to commit the crime charged. See *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). Such evidence may be admissible, however, if

---

[16]We note, on the basis of our responsibility under G. L. c. 278, § 33E, that nothing in the record refutes the judge's implicit conclusion at trial that the search of the wallet, and consequent discovery of the Keno tickets, was well within the limits of the Fourth Amendment to the United States Constitution as well as arts. 12 and 14 of the Massachusetts Declaration of Rights.

[17]The jury also heard testimony that the bill was from the witness's paycheck for work at a nursing home and was intended to be given to the witness's mother as payment for day care for her daughter.

relevant for some other probative purpose, including for the purpose of showing intent, motive, state of mind, or some other relevant issue at trial. See *Commonwealth* v. *DelValle*, 443 Mass. 782, 790 (2005); *Commonwealth* v. *Leonard*, 428 Mass. 782, 786 (1999). The judge was well within his discretion to admit the challenged testimony. Evidence that the defendant had been rejected by the female bartender not only placed the defendant at the bar on Friday night, but was probative of his state of mind as he left after closing time. Evidence that the defendant owed a substantial amount of money in child support, and his immediate need to repay the allegedly stolen one hundred dollars before August 26, were highly probative of his state of mind, specifically, his need for money.

The judge informed the jury, in separate, carefully worded, instructions, that the defendant was not charged with failing to pay child support or with stealing the one hundred dollar bill; that they were not to consider either issue in their deliberations; and that the evidence was relevant only to the defendant's state of mind. The prosecutor did not refer to the challenged testimony in his closing argument, other than to suggest that the defendant's need of money constituted a motive for the murder. We agree with the judge that the probative value of this testimony was not outweighed by its potential prejudicial impact on the jury. Whatever weight, if any, to be given the evidence was for the jury to decide. The judge's rulings were not in error.[18]

5. We have reviewed the entire record and find no reason to set aside or reduce, pursuant to G. L. c. 278, § 33E, the defendant's conviction of murder in the first degree. Despite whatever amount of alcohol the defendant consumed at the Tyler Café on Friday, August 16 (there was evidence that the de-

---

[18]The defendant also challenges the admission of other pieces of testimonial evidence, including racially and sexually charged comments in the defendant's first statement; further testimony of the bartender at the Tyler Café, recounting an incident involving the defendant that occurred as she left the bar at 3 A.M. on August 17; and further testimony in connection with the marijuana that the defendant had kept at Bradley's house. The testimony drew no objection from the defendant's trial counsel. Although certain portions may have been unnecessarily inflammatory, we conclude that, in light of the compelling nature of the Commonwealth's admissible evidence, any error in the admission of the testimony could not have created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Squailia*, 429 Mass. 101, 104 n.2 (1999).

fendant's bar bill that evening was forty dollars), the jury were properly instructed on the issue of intoxication as a mitigating factor, and obviously found, beyond a reasonable doubt, that the defendant had formed the intent necessary to convict him of deliberately premeditated murder. The verdict also demonstrates that the jury found to be present beyond a reasonable doubt one (or more) of the seven factors required to convict on the theory of extreme atrocity or cruelty. See *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983). The evidence was overwhelmingly sufficient to justify the conviction of murder on both theories.

6. The Commonwealth obtained four separate indictments charging the defendant with larceny: the first for the missing cash; the second for one missing ring; the third for the other missing ring; and the fourth for the missing lottery tickets. The defendant claims that all but one of the larceny charges were duplicative on the ground that the alleged acts were part of a single criminal scheme and, therefore, should have been prosecuted as a single indictment charging larceny.[19] We agree with the defendant that the facts of this case are controlled by what this court restated in *Commonwealth* v. *Donovan*, 395 Mass. 20, 29 (1985): "[W]here it appears that successive takings are actuated by a single, continuing criminal impulse or intent or are pursuant to the execution of a general larcenous scheme, such successive takings constitute a single larceny regardless of the extent of the time which may have elapsed between each taking." *Id.*, quoting *Commonwealth* v. *Stasiun*, 349 Mass. 38, 45 (1965).

The relevant evidence demonstrates that the defendant beat the victim to death; searched the victim's one-room apartment; discovered, and took, cash, two rings, and the Keno tickets; and fled. Because, as in the *Donovan* case, there was "but one incident" of taking from the victim, at a single time and at a

---

[19] At the end of the Commonwealth's case, the defendant moved for required findings of not guilty on all but one of the larceny charges as duplicative. The judge denied the defendant's motion. The defendant renewed his motion at the end of all the evidence, and the judge denied the renewed motion. After the verdicts were read, the defendant again renewed the motion and, again, the judge denied it. The defendant filed a motion for required finding of not guilty, pursuant to Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979). The judge denied the motion. Finally, the defendant filed a motion for reconsideration, which the judge denied.

single place, the defendant properly should have been indicted on only one charge of larceny. *Commonwealth* v. *Murray*, 401 Mass. 771, 775 (1988).

7. The judgment of conviction of murder in the first degree is affirmed. One judgment of conviction of larceny over $250 is affirmed. The remaining judgments of conviction of larceny, and the sentences imposed, are vacated.[20] The case is remanded to the Superior Court for dismissal of the remaining two indictments charging larceny over $250 and the indictment charging larceny under $250, and for a determination whether the sentence imposed on the remaining larceny conviction is still appropriate, and, if not, for vacation of the sentence imposed and resentencing.

*So ordered.*

---

[20]The defendant's conviction of larceny under $250 had been placed on file with the defendant's consent. It is proper nonetheless that the conviction be vacated and the indictment dismissed. See *Commonwealth* v. *Smiley*, 431 Mass. 477, 491 n.10 (2000).