## COMMONWEALTH vs. PEGGY TOLAN.

Bristol. December 5, 2008. - April 14, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, & CORDY, JJ.

*Practice, Criminal,* Admissions and confessions, Waiver, Voluntariness of confession, Assistance of counsel, Instructions to jury, Capital case. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights, Assistance of counsel. *Evidence,* Expert opinion, Judicial discretion. *Homicide.*

A Superior Court judge hearing a criminal defendant's pretrial motion to suppress statements that she made to police during a lengthy interrogation did not err in concluding that the defendant's statements were voluntary, where the defendant failed to demonstrate that certain statements by the police officers amounted to impermissible promises of leniency or even produced any admissions on her part; where neither the duration nor the physical characteristics of the interrogation rendered it coercive; and where the judge properly considered the testimony of both psychiatric experts in concluding that the defendant's statements were freely and voluntarily given [642-644]; further, the judge's factual findings supported his ultimate conclusion that the defendant's waivers of her Miranda rights were knowing and voluntary in the totality of the circumstances [644].

At a murder trial, defense counsel did not render ineffective assistance by failing to elicit testimony regarding the implied promises of leniency made to the defendant during her police interrogation, where reference to such implied promises would have contributed little, if anything, to the theory of the defense [644-646]; moreover, no ineffective assistance resulted from defense counsel's failure to request that references in the trial testimony to the sexual practices of the defendant and the victim be struck from the record, where there was a legitimate strategic reason for that decision, and where, at any rate, it was unlikely that the verdict was influenced by the evidence [646].

At a murder trial, the judge acted well within his discretion in limiting the proposed testimony of a defense expert regarding the voluntariness of statements made during the defendant's interrogation. [646-648]

The evidence at a murder trial did not warrant a jury instruction on the lesser included offense of involuntary manslaughter. [648-650]

A defendant convicted of murder in the first degree failed to demonstrate any substantial likelihood of a miscarriage of justice arising from the trial judge's instructions to the jury with respect to accident, murder in the second degree, or deficiencies in the police investigation. [650-652]

INDICTMENT found and returned in the Superior Court Department on December 18, 2002.

A pretrial motion to suppress evidence was heard by *Robert J. Kane*, J.; the case was tried before *Richard J. Chin*, J., and a motion for a new trial, filed on December 29, 2006, was heard by him.

*Peter M. Onek*, Committee for Public Counsel Services, for the defendant.

*Shoshana E. Stern*, Assistant District Attorney (*Rachel J. Eisenhaure*, Assistant District Attorney, with her) for the Commonwealth.

CORDY, J. On the morning of December 3, 2002, the defendant, Peggy Tolan, telephoned 911 and told the dispatcher that her husband, Edward Tolan (Edward), had been shot. Paramedics responded to the Tolans' home and found Edward's body in the bedroom; he had died of a single gunshot wound to the head fired at close range. On November 9, 2004, a jury convicted the defendant of premeditated murder in the first degree. Tolan filed a motion for a new trial, alleging ineffective assistance of counsel, which was denied. She appealed from the denial of the motion for new trial, which was consolidated with her direct appeal. On appeal, she argues that (1) the motion judge erred in denying her motion to suppress the statements she made to police during a lengthy interrogation; (2) defense counsel was ineffective for failing to elicit testimony at the trial regarding implied promises of leniency made to her during the interrogation and for failing to request that references in the trial testimony to the sexual practices of the defendant and her husband be struck; (3) the trial judge erred in his ruling limiting the proposed testimony of a defense expert regarding the voluntariness of statements made during the defendant's interrogation; (4) the jury should have been instructed on involuntary manslaughter as an alternative to murder; and (5) the judge's jury instructions contained various other errors that prejudiced the defendant. We reject the defendant's arguments, and after reviewing the entire case pursuant to G. L. c. 278, § 33E, we decline to exercise our authority to reduce the degree of guilt or order a new trial.

1. *The trial.* Based on the evidence presented by the Commonwealth, the jury could have found the following facts.

In 1997, the defendant moved into Edward's home in North Dartmouth. They subsequently married in 1998. This was

Edward's second marriage; his first wife had died, and he had two grown daughters.

Edward was an alcoholic whose drinking increased over the last two years of his life. The defendant bought him a thirty-pack of beer several times a week, and police officers found hundreds of empty cans around the house. The increased drinking habit began when he lost his job as an assayist, then continued after he began a new job conducting quality control for Decas Cranberry. He would regularly stay up late at night on his computer, often reading antigovernment and conspiracy Web sites. Over time, his health began to suffer. By Thanksgiving of 2002 he had lost weight, his teeth appeared to be rotting, and he exhibited signs of depression.

The defendant was well educated, having attended both community college and the University of Rhode Island, where she studied nursing. In 2002, she worked at LensCrafters fabricating eyewear. She always appeared neat and well dressed at work. She (falsely) told coworkers that she was financially secure and worked only to "get out of the house." She also told them that her husband was an alcoholic, but that she remained with him because she was in control of the relationship and was able to buy whatever she wanted. The Tolans owned a number of guns, including four handguns and five rifles. The defendant claimed to own a .38 caliber handgun and to know how to use it.

At home, the defendant handled all the family finances, including writing checks and making mortgage payments. The jury could have concluded that she spent their money unwisely, ultimately resulting in financial problems. At the time of Edward's death, the Tolans had retirement accounts valued at $5,000 and about $5,000 in other accounts. The defendant was also designated as Edward's beneficiary on a $10,000 life insurance policy through his current employer, and was designated as the beneficiary on Edward's $30,000 retirement plan from a former employer.

Edward was particularly attached to his home. He owned it during his first marriage and had raised his children there. Its fair market value was $200,000 in 2002, and it had an outstanding mortgage of just under $90,000. Unfortunately, the defendant regularly missed mortgage payments, and the house was foreclosed on and auctioned off in September, 2002, for $99,000.

The jury could have concluded that the defendant kept from Edward the fact that the house had been sold at auction.[1] The purchaser was Robert Caton, whose primary business was to purchase foreclosed homes and resell them. He approached the defendant soon after buying it to ask whether she intended to move out or repurchase the home. The defendant initially said that they would move out within a couple of weeks, but she later offered to repurchase the house for $175,000. Caton agreed to the offer, and they planned to meet on the evening of December 2, 2002, so that the defendant could deliver a $5,000 down payment. All of the discussions regarding the repurchase of the home were between the defendant and Caton. Caton never saw or spoke to Edward.

The defendant never arrived at the agreed meeting place on December 2. Several hours later, she contacted Caton and told him that her father was ill, and that she had taken him to a hospital. They agreed to reschedule the meeting to 9 A.M. the next morning, December 3.

A few minutes after 9 A.M. on December 3, the defendant telephoned Caton and told him, "We're on our way," and then snickered. At 9:23 A.M., Caton contacted the defendant to check on her location; she told him that she was still on her way, and driving down Route 195. When she had not arrived by 9:35 A.M., Caton telephoned and left a voicemail message.

At 9:33 A.M., the defendant telephoned 911 and stated that she had arrived home to find Edward in bed, apparently sleeping,[2] with a gun in his hand; that she "went to take it away from him and I think I just shot him." The dispatcher sent paramedics and officers to the Tolans' house; they found Edward's body lying in bed. Though he was lying on his back, his knees were pointed to the left and his right arm outstretched to the right, resting on the bed. In his right hand, he loosely gripped a

---

[1]There was testimony that in the summer of 2001, more than one year before Edward's death, Edward had received a letter advising him that mortgage payments had been missed. Edward became very angry, yelling at the defendant for over one hour.

[2]The defendant subsequently told the police that Edward had been up all night on the computer and drinking beer, and that he had gone to sleep at 7:30 A.M. that morning. Toxicology tests performed during the autopsy revealed Edward's blood alcohol level to be .25.

Smith & Wesson .38 caliber handgun, his finger on the trigger, inside the trigger guard. He had a wound on his lower right cheek, and an exit wound at the back of his skull. Paramedics detected no breathing or pulse.

The medical examiner who performed the autopsy determined the manner of Edward's death to be homicide. In examining Edward's hands, which had been "bagged" at the scene, the medical examiner found no apparent gun shot residue.[3] Based on the "soot" found on the entrance wound, the medical examiner concluded that the gun was fired from between two and six inches from Edward's face.

The gun was tested by a ballistics expert, who confirmed that the bullet that killed Edward was fired from the gun found in his hand. He also identified gunpowder residue on the outside of the gun, and determined that the gun required ten pounds of rearward pressure to fire if it was not cocked.[4] The ballistics expert also conducted gunpowder residue tests with the gun, and determined that when the gun was fired, it was less than nine inches from Edward's cheek, but was not in contact with his face.

The defendant was at the house when paramedics and officers first arrived. She appeared upset, but was subdued and not crying. She said that she was willing to speak with the police, and rode with Trooper Michel King of the State police to the Dartmouth police station, where they were joined by Detective Walter Garcia of the Dartmouth police department. The defendant remained at the police station for the next eleven hours, speaking with Trooper King and Detective Garcia periodically over that period for a total of about five and one-half hours. At the end of the interview, she was placed under arrest.

The interview was a primary focus of both the motion to suppress and the trial. To avoid repetition, we now recite facts that

---

[3]On redirect examination, the medical examiner acknowledged that to examine Edward's hands he had to wipe blood off of them, and that this process could have removed some of the gun shot residue, although he cleaned the area "very carefully" to make sure that any potential gunpowder residue was not being removed. No chemical tests were done to confirm the presence or absence of gunshot residue.

[4]If the gun had been cocked, it would have taken two or three pounds of pressure.

were presented by the Commonwealth at the evidentiary hearing on the motion to suppress, credited by the motion judge, and presented by the Commonwealth at trial.

After arriving at the station, the defendant entered a police interview room with Trooper King and Detective Garcia. A sign at the entrance notified the defendant that interviews were recorded by a videotaping system, and she knew she was being recorded. The videotape recorded properly, but the audio component recorded at an incorrect speed due to human error. Despite several attempts to improve the quality, including an attempt by the Federal Bureau of Investigation, the audio was largely unintelligible; the parties played only short segments at the suppression hearing and at trial.

The questioning began at 11:20 A.M. The room was comfortable and adequately ventilated. During the interrogation, King repeatedly offered the defendant food, drinks, and the opportunity to use the restroom. She turned down most of these offers; she ate only part of a muffin and drank some water.

Initially, the defendant explained that she left the house that morning to meet Caton for the purpose of repurchasing her home. She told the officers that her husband had given her a check for $5,000 the night before, and that she intended to deliver it to Caton. While she was on the way to the meeting, however, she called home and received no answer. She became worried and returned home. Once home, she went to check on her husband, who was in bed. She told the officers that he was rolled over toward the window, facing away from her, apparently sleeping, and that she saw the gun cradled by his stomach. She said that she climbed onto the bed and attempted to take the gun from him; as she grabbed the gun, it fired, and then ended up in her hand.

When the defendant finished, the officers began probing details of her account. King asked how the defendant could see the gun while her husband was facing away from her; she stated that he had rolled toward her, exposing the gun. King also asked why the gun fired, and she responded that her husband's hand had moved and that startled her, which caused her to fire the gun. She claimed that she dropped the gun on the bed after it fired; however, when the officers told her that the gun had been found

in her husband's hand, she said, "I don't know if I had done that. I must have done that." Although the defendant's explanation of precisely how the shooting occurred varied during the interrogation, she always maintained that it was accidental.

Originally, the defendant told the police that when she returned to her home that morning she brought the $5,000 check (intended for Caton) back with her, and that it was either in the bedroom or in the car. After searching for several hours, the officers told the defendant that the check was not in either location. Near the end of the interview, she changed her story and told the police that while she was driving to meet Caton she had held the envelope which contained the check, up against the light, and saw that it contained only ripped up pieces of paper, so she rolled down the window and threw it out of the car, then returned home to tell her husband to deal with Caton himself.

King also pressed the defendant on a possible telephone call the police believed she had made to Caton after her husband was shot. Based on Caton's statements to the police, King and Garcia believed that the defendant had made a call to Caton at 9:35 A.M. (after the 911 call), and eventually she agreed that she had done so. Later, however, officers learned that it was Caton who had placed the call to the defendant at 9:35 A.M. (when she had failed to arrive at their meeting), and that the defendant's call to Caton occurred before the 911 call.

King secured the defendant's waiver of her Miranda rights at several points during the interrogation, though he also informed her that she was not under arrest. At the beginning of the interrogation, King read the Miranda warnings, and the defendant stated that she understood each one. Later, at 4 P.M., King asked whether she wished to continue speaking with the officers, and she said she did. Garcia read the Miranda warnings to her again several hours later. She responded, "Do I need a lawyer?" Garcia did not answer the question, and the defendant said, "I'll talk to you."

*Discussion.* 1. *Motion to suppress.* The defendant moved to suppress the statements she made during her lengthy interview with the police. The subsequent four-day evidentiary hearing focused on whether the defendant's waiver of her Miranda rights, or any of her statements generally, were voluntary. The

judge issued his ruling in a written memorandum in which he made extensive findings of fact supporting his conclusions that the defendant's statement was voluntary and her Miranda waivers were voluntary, knowingly, and intelligently given.

In addition to the evidence described above regarding the interview, the judge heard testimony from two expert witnesses. Dr. Keith Ablow, a psychiatrist, testified as an expert for the defendant,[5] and Dr. Paul Appelbaum, a former president of the American Psychiatric Association, testified for the Commonwealth. Dr. Ablow testified that the defendant lacked the free will to waive her rights or to answer questions, relying on his opinion that she had a submissive personality disorder and an active stress disorder. Dr. Appelbaum testified to the contrary. After having interviewed the defendant and watched the videotape recording of the police interview, he concluded that the defendant's statements were voluntary and that changes in her story over the course of the interview were not due to any mental disorders, but were the result of her being confronted "with factual assertions that she couldn't dispute and that didn't fit with the story she had told previously."

The motion judge concluded that the evidence did not support Dr. Ablow's diagnosis. He reasoned that contrary to Dr. Ablow's theory that the defendant lacked free will, the defendant repeatedly rejected the officers' suggestions that she intended to kill her husband, that she arrived at the house much earlier than 9:30 A.M., and that she entered the room possessing the gun. She also repeatedly ignored the officers' statements that she should eat something. These facts, the motion judge found, fatally undermined Dr. Ablow's medical opinion. The judge also rejected Dr. Ablow's diagnosis that the defendant suffered memory defects due to an acute stress disorder, finding that the record failed to support that theory, because she demonstrated an ability to recall, months later, specific facts about the events of December 3.

"In reviewing the judge's decision, we 'give[] substantial deference to the judge's ultimate findings and conclusions of law, but independently review the correctness of the judge's applica-

---

[5]The defendant did not call Dr. Ablow to testify at trial. See part 3, *infra.*

tion of constitutional principles to the facts found.' " *Commonwealth* v. *LeBeau*, 451 Mass. 244, 254 (2008), quoting *Commonwealth* v. *Morse*, 427 Mass. 117, 122 (1998). "Because the defendant was advised of, and waived, [her] Miranda rights, the issue becomes whether the Commonwealth has proved, by a totality of the circumstances, that the defendant made a voluntary, knowing, and intelligent waiver of [her] rights, and that [her] statements were otherwise voluntary." *Commonwealth* v. *LeBeau*, *supra* at 254-255, and cases cited.

a. *Statements.* The judge did not err in concluding that the defendant's statements were voluntary. "A statement is voluntary if it is the product of a 'rational intellect' and a 'free will,' and not induced by physical or psychological coercion." *Commonwealth* v. *LeBlanc*, 433 Mass. 549, 554 (2001). Courts must review "the totality of the circumstances," considering factors such as "promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings." *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986).

On appeal, the defendant focuses on four factors that she argues should have resulted in the suppression of her statements: (1) implied promises of leniency by the officers; (2) the duration of the interrogation; (3) the physical conditions of the interrogation; and (4) the expert's opinion that she suffered from mental illnesses. Even when analyzed together under the "totality of the circumstances" test, these factors do not call into doubt the judge's findings and conclusion that the defendant's statements were voluntary.

First, the defendant did not claim either in her motion to suppress or at trial that what she terms "implied promises of leniency" made by the police affected the voluntariness of her statements. Consequently, we review the claim only to determine whether the statements made create a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Lodge*, 431 Mass. 461, 474 (2000). No such likelihood exists here. In determining

whether the officers' implied promises of leniency were likely to have affected the voluntariness of the defendant's statements, the "touchstone is whether the police 'assured' the defendant that [her] confession would aid [her] defense or result in a lesser sentence." *Commonwealth* v. *Jordan*, 439 Mass. 47, 53 (2003), quoting *Commonwealth* v. *Meehan*, 377 Mass. 552, 564 (1979), cert. dismissed, 445 U.S. 39 (1980). "An officer may suggest broadly that it would be 'better' for a suspect to tell the truth, may indicate that the person's cooperation would be brought to the attention of the public officials or others involved, or may state in general terms that cooperation has been considered favorably by the courts in the past." *Commonwealth* v. *Meehan*, *supra*.

In this case, the defendant points to four statements (made over the course of eleven hours): "You can do yourself a lot of good if you tell us what happened"; "We'll help you because that's why we're here, to find the truth"; "Now it's time to help yourself out"; and, "You need to help yourself by telling the truth." None of the statements provides the type of "assurance" forbidden by *Commonwealth* v. *Meehan*, *supra*; all are more similar to the broad suggestion that it would be "better" to tell the truth. *Id.* The officers "did not overstep the permissible line" by offering leniency or promising that a confession would assist in the defense. See *Commonwealth* v. *Ortiz*, 435 Mass. 569, 577 (2002), and cases cited. Moreover, the officers' entreaties did not produce any admissions (as distinguished from inconsistencies) on her part, and could not possibly have resulted in a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Lodge*, *supra*.

Second, the defendant argues that the duration of the interrogation rendered it coercive. However, the length of the interview is merely one factor in the over-all voluntariness assessment. *Commonwealth* v. *Cruz*, 373 Mass. 676, 688 (1977). Although the defendant remained in the same room for eleven hours, which, at first blush, might appear onerous, the interrogation was not continuous, and the officers allowed her to take several breaks throughout the day. They also reminded her that she was free to leave and free to request an attorney at any point.

Third, the defendant argues that her failure to use the rest-

room and her minimal intake of food and water during the interview affected the issue of voluntariness. While such facts are fairly considered, the judge did not find them to have been of great significance on the question of voluntariness. The defendant's conduct was consistent with stress caused by the death of her husband and subsequent investigation, and not in any way by improper police actions. To the contrary, the police officers repeatedly offered the defendant food, drinks, and use of the restroom, bringing her slices of pizza and a muffin, in an effort to alleviate the defendant's distress.

Finally, the defendant argues that the motion judge erred in rejecting Dr. Ablow's opinion that the defendant suffered from mental illnesses. We disagree. Although the defendant exhibited signs of stress, she engaged with the officers' questions and rejected many of the suggestions they made. The judge properly considered the testimony of both psychiatric experts in concluding that the defendant's statements were freely and voluntarily given. The facts found by the motion judge were supported by the evidence and consistent with his decision not to credit Dr. Ablow's opinion.

In sum, three of the four factors pressed by the defendant were fairly considered by the judge, and we have no basis to reject his findings and his conclusions that, in the totality of the circumstances, her statements were voluntary. Our consideration of the fourth factor, characterized as implied promises of leniency made by the officers, does not raise any additional concern that the statements were not voluntary.

b. *Miranda waiver.* As explained above, the judge found that the officers advised the defendant of her Miranda rights multiple times, asked her to repeat them, and asked her whether she agreed to speak to them voluntarily. They also told her that she could have a lawyer and could leave at any time. The judge's factual findings were supported by the evidence, and those findings support his ultimate conclusion that her waivers were knowing and voluntary in the totality of the circumstances. See *Commonwealth* v. *LeBeau*, 451 Mass. 244 (2008).

2. *Ineffective assistance of counsel.* The defendant alleges that trial counsel was ineffective because he failed to introduce evidence at the trial that the police officers made implied offers

of leniency to her during the interrogation, where this evidence was relevant to the jury's consideration of the voluntariness of her statements under our humane practice rule. She also claims that her counsel was ineffective in failing to move to strike prejudicial evidence of the defendant's sexual practices.

"In evaluating a claim of ineffective assistance of counsel in a case of murder in the first degree, we begin by determining whether there was a serious failure by trial counsel." *Commonwealth* v. *Harbin*, 435 Mass. 654, 656 (2002). If a serious failure is found on the part of counsel, the court then determines whether the failure resulted in a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Shuman*, 445 Mass. 268, 276 (2005). "An error creates a substantial likelihood of a miscarriage of justice if it was likely to have influenced the result." *Commonwealth* v. *Martin*, 427 Mass. 816, 817-818 n.2 (1998).

"In determining whether there has been a serious failure, we give trial counsel's tactical decisions due deference, and 'do not "second guess competent lawyers working hard for defendants who turn on them when the jury happen to find their clients guilty." ' " *Commonwealth* v. *LaCava*, 438 Mass. 708, 713 (2003), quoting *Commonwealth* v. *Street*, 388 Mass. 281, 285 (1983). We will not find ineffectiveness unless the decision was "manifestly unreasonable when made." *Commonwealth* v. *LaCava*, *supra*, quoting *Commonwealth* v. *Martin*, *supra* at 822.

The defendant's claim that defense counsel was ineffective for failing to introduce the aforementioned offers of implied leniency made by the police is unavailing. The theory of the defense was accident, and defense counsel's strategy with respect to the police interrogation was apparent: no matter how long, onerous, and stressful the interrogation was, the defendant never wavered in her claim that the shooting was accidental. In closing, for example, defense counsel argued that "[d]espite eleven hours in that ten by six sweatbox, Peggy Tolan, no matter what questions were asked, what suggestions were made, what she was asked to agree to, time and time again she maintained it was an accident." In this context, reference to implied promises of leniency, as weak as such references were, would have been a distraction contributing

little, if anything, to the defense.[6] There was no serious failure by counsel.

The defendant next claims that trial counsel committed a serious failure when he did not move to strike evidence about the Tolans' sexual practices — essentially that they engaged in bondage, possessed sexual aids and paraphernalia, and owned a pornographic videotape recording. At the evidentiary hearing on the motion to suppress, evidence on this subject was introduced to buttress Dr. Ablow's testimony that the defendant suffered from a submissive personality disorder. At trial, defense counsel elicited some of that evidence in the cross-examination of two Commonwealth witnesses, in anticipation of Dr. Ablow's testimony. However, defense counsel ultimately chose not to call him as a witness. In these circumstances, defense counsel probably had grounds to ask that the evidence be struck as no longer relevant, but his neglect to do so was not a serious failure on his part. There was a legitimate strategic reason not to highlight the evidence a second time. The references were very limited and came early in the trial. Striking the evidence would have emphasized it in the minds of the jury. We agree with the judge, who ruled on this issue in connection with the defendant's motion for a new trial, that "every reasonable trial counsel could have made the same tactical decision."

Moreover, it is unlikely that the verdict was influenced by this evidence. The Commonwealth did not mention the testimony in closing arguments, nor did defense counsel. The testimony constituted a very brief portion (a few pages of the transcript in total) of the seven-day trial. Finally, in contrast to the evidence at the hearing on the motion to suppress, the evidence was presented verbally, and no photographs or exhibits were introduced.[7]

3. *Restrictions on Dr. Ablow's testimony.* On appeal, the

---

[6]We reach this conclusion cognizant of the affidavit filed by defense counsel stating that he had no tactical reason to omit the statements. See *Commonwealth v. Acevedo*, 446 Mass. 435, 447 n.16 (2006) (after review of record, court discounted trial attorney's affidavit in deciding whether he considered certain trial strategy).

[7]In anticipation that even more explicit evidence on the sexual practices of the defendant and her husband might be introduced at the trial, the judge asked questions of prospective jurors to ensure that such evidence would not affect their ability to be fair and impartial.

defendant argues that the judge erred in ruling that he would limit the testimony of Dr. Ablow in certain respects. Defense counsel ultimately decided not to call Dr. Ablow as a witness, and did not object to the judge's ruling at trial.[8] When an issue or argument is not raised below in a case such as this, we "review it pursuant to G. L. c. 278, § 33E, only to determine whether, if there was error, such error created a substantial likelihood of a miscarriage of justice." *Commonwealth* v. *Leahy*, 445 Mass. 481, 487 (2005).

We review a judge's decision regarding the admission of expert testimony only for abuse of discretion. *Commonwealth* v. *Robinson*, 449 Mass. 1, 5 (2007). The matter unfolded in the following fashion. On the third day of the trial, defense counsel informed the judge that he might call a psychiatrist to testify "[o]n voluntariness . . . and probably on [the defendant's] state of mind on December 3." In response, the judge, citing *Commonwealth* v. *DiGiambattista*, 442 Mass. 423 (2004) (*DiGiambattista*), told counsel that he would not permit the expert to testify to his opinion as to whether the defendant's statements were voluntary, but that the witness could testify about her mental condition. In a later conversation on the fifth day of trial, defense counsel offered that Dr. Ablow would opine that the defendant "had a preexisting medical condition which made her susceptible to suggestion." The judge appeared to accept that proposal, but stated that Dr. Ablow could not "comment on the manner in which [Tolan] was interrogated." The prosecutor informed the judge that if the defendant called Dr. Ablow he was prepared to call Dr. Appelbaum in rebuttal. The defendant decided not to call Dr. Ablow.

"[A] question calling for an opinion which is in the domain of the expert's professional knowledge is not necessarily to be excluded merely because the expert's conclusion reaches or approaches the ultimate issue before the jury," *Commonwealth* v. *Colin C.*, 419 Mass. 57, 59 (1994), but "[t]hat decision 'rests in the broad discretion of the judge,' " and will be reversed only for abuse of discretion or error of law. *Commonwealth* v. *Vao Sok*, 435 Mass. 743, 757 (2002), quoting *Commonwealth* v.

---

[8] It is not apparent from the record that the judge's ruling was the only, or even the principal, reason for defense counsel's decision not to call Dr. Ablow.

*Pike*, 430 Mass. 317, 324 (1999). We find no abuse of discretion here.

It was within the judge's discretion to preclude testimony touching on "the alleged relationship between various interrogation techniques and false confessions." *DiGiambattista, supra* at 437. Such testimony can be problematic "because it constitutes an opinion on the ultimate issue to be decided by a jury." *Id.* Nor was it impermissible for the judge to preclude expert testimony on commonly understood interrogation methods because "such interrogation techniques can be understood by jurors without expert assistance." *Id.* at 437-438. Moreover, here there was no false confession, indeed there was no confession at all. The defendant claimed accident throughout. It was therefore well within the judge's discretion to exclude expert testimony as to interrogation techniques that might lead to false confessions. The judge did not commit any error, let alone one causing a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Boyarsky*, 452 Mass. 700, 710 (2008).

4. *Involuntary manslaughter instruction.* At the conclusion of the evidence, the prosecutor requested that the judge instruct the jury on the lesser included offense of involuntary manslaughter. This would have provided the jury with an option to convict the defendant of something less than murder in the second degree. Defense counsel did not join in the request. To the contrary, he interrupted the prosecutor to interject, "If your Honor please, that's if your Honor's view of the evidence is that it admits of a lesser crime." The judge responded, "Okay . . . I don't think there's any evidence of her wanton or reckless conduct. I'll charge on first and second degree." There was, understandably, no objection from defense counsel, who was plainly unwilling to permit the jury the option of reaching a compromise verdict.

If the evidence warranted an instruction on involuntary manslaughter, the Commonwealth was entitled to it and it should have been given. *Commonwealth* v. *Woodward*, 427 Mass. 659, 663 (1998). If there was error, it was not preserved by the defendant, and we review it under the substantial likelihood of a miscarriage of justice standard. *Commonwealth* v. *Dagenais*, 437 Mass. 832, 842 (2002).

Involuntary manslaughter includes an unintentional killing

occurring while the defendant is engaged in wanton or reckless conduct that creates a high degree of likelihood that substantial harm will result to another. See *Commonwealth* v. *Sneed*, 413 Mass. 387, 393-394 & n.4 (1992), citing *Commonwealth* v. *Welansky*, 316 Mass. 383, 397-398 (1944). The central question is whether there was sufficient evidence at trial to support a finding that the defendant intentionally acted in a wanton or reckless manner, which unintentionally caused her husband's death. *Commonwealth* v. *Sneed, supra.* We consider the evidence in the light most favorable to the defendant. See *Commonwealth* v. *Degro*, 432 Mass. 319, 330 (2000), quoting *Commonwealth* v. *Nichypor*, 419 Mass. 209, 216 (1994).

We agree with the judge that there was insufficient evidence of reckless or wanton conduct to require an instruction. A survey of Massachusetts cases demonstrates the type of behavior that is considered "reckless" in the presence of guns, warranting a verdict of involuntary manslaughter. See, e.g., *Commonwealth* v. *McCauley*, 355 Mass. 554, 555-558 (1969) (defendant purposefully pulled slide and trigger thinking gun would not fire, killing victim); *Commonwealth* v. *Atencio*, 345 Mass. 627, 629-631 (1963) (defendants played "Russian Roulette," killing victim); *Commonwealth* v. *Power-Koch*, 69 Mass. App. Ct. 735, 736-738 (2007) (defendant who had no familiarity with handguns and did not know gun was loaded pulled trigger, killing victim); *Commonwealth* v. *Figueroa*, 56 Mass. App. Ct. 641, 650-651 (2002) (defendant intentionally punched victim while finger was on trigger of gun, which fired and killed victim); *Commonwealth* v. *Depradine*, 42 Mass. App. Ct. 401, 402-405 (1997) (defendant purposefully pulled trigger, killing victim).

The defendant's claim that there was evidence of wanton and reckless conduct relies on a thin evidentiary reed, plucked from a seven-day trial. Specifically, Detective Garcia testified that during the interrogation, he asked the defendant why she picked the gun up with her finger on the trigger; she responded, "I don't know." He then testified that he asked her why she did not pick up the gun in a safer manner; again, she said, "I don't know." In context, those statements are insubstantial, and do not constitute evidence that requires an involuntary manslaughter instruction. The entire defense was premised on the theory of

accident, on which there was substantial evidence. Equivocal answers to a few questions scoured from the transcript of a seven-day trial by able appellate counsel is insufficient to convert the trial into something it was not.

In any event, if the judge's ruling was error at all, it was not one likely to have created a substantial likelihood of a miscarriage of justice. The jury rejected the option of murder in the second degree, the malice element of which comes closest to involuntary manslaughter.[9] In finding the defendant guilty of murder in the first degree, the jury necessarily found that the defendant had both a specific intent to kill and that the shooting was premeditated. These findings negate the possibility of involuntary manslaughter. Cf. *Commonwealth* v. *Chase*, 433 Mass. 293, 300 (2001) ("no likelihood that the jury found the defendant merely to be negligent, in view of the fact that they must have found he acted with a conscious disregard for human life to convict him of felony-murder").

5. *Other jury instructions.* The defendant claims that the judge erroneously instructed the jury with respect to accident, murder in the second degree, and deficiencies in the police investigation. There was no objection at trial, and "we review the challenged instructions, pursuant to G. L. c. 278, § 33E, to determine whether they created a substantial likelihood of a miscarriage of justice." *Commonwealth* v. *Nardi*, 452 Mass. 379, 397 (2008), citing *Commonwealth* v. *Oliveira*, 445 Mass. 837, 842 (2006).

The challenged accident instruction is set out in the margin.[10]

---

[9] As the judge properly instructed, malice for purposes of murder in the second degree includes "an intent to do an act that in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death will result." See *Commonwealth* v. *Novo*, 449 Mass. 84, 99 (2007).

[10] "The defendant does not have to prove anything in a criminal trial. The Commonwealth must prove beyond a reasonable doubt every element of the crime. In this case, there is evidence that what occurred may have been an accident. *You must therefore determine whether the defendant intentionally committed the act or whether what occurred was an accident.* An accident is defined as an unexpected happening that occurs without intention or design on the defendant's part. It means a sudden, unexpected event that takes place without the defendant's intending it. If an act is accidental, it is not a crime.

"When considering the evidence, bear in mind that the defendant does not

The defendant argues that the Commonwealth had the burden of demonstrating that the shooting was not an accident, and that the judge improperly lifted that burden when he stated, "You must therefore determine whether the defendant intentionally committed the act or whether what occurred was an accident." This statement is taken out of context. The judge repeatedly stated that the defendant was not required to prove anything; that the Commonwealth must prove every element of the crime beyond a reasonable doubt; and specifically that "[t]he Commonwealth must prove beyond a reasonable doubt that what occurred was not an accident." There was no error.

With respect to the murder in the second degree instruction, the defendant emphasizes that at one point, the judge stated that: "[i]f . . . you find the Commonwealth has not proved beyond a reasonable doubt either one of the two elements of murder in the second degree, you must find the defendant *guilty*" (emphasis added). If not an error in transcription, this was obviously a slip of the tongue, unnoticed by either counsel at the time. *Commonwealth* v *Oliveira, supra* at 844. In context, there is little chance that the jury would have understood this as anything other than a slip of the tongue, otherwise the instruction as a whole made no sense. *Commonwealth* v. *Lucien,* 440 Mass. 658, 669 (2004). The slip is further proved harmless by the jury's verdict. The defendant was not convicted of murder in the second degree.

Finally, the defendant requested, and the judge gave, an instruction that the jury could consider any deficiencies in the investigation of the case (particularly at issue was the failure to perform certain tests),[11] and whether those deficiencies "affect the quality or reliability of the evidence presented by the Commonwealth," or "tend to show the existence of police bias against the defend-

---

have to prove anything. The Commonwealth must prove beyond a reasonable doubt that what occurred was not an accident. If the Commonwealth has failed to prove to you beyond a reasonable doubt that what occurred was not an accident, then you must find the defendant not guilty." (Emphasis added.)

[11]The basis for this instruction, the defendant contends, is that the police never conducted any chemical test on Edward Tolan's hands for gunpowder residue, the existence of which could have demonstrated that his hand was on the gun when it fired. Although the medical examiner testified that he did not observe any residue when he examined Edward's hands during the autopsy, he did not perform any tests to determine its presence. See note 3, *supra.*

ant.'' See *Commonwealth* v. *Bowden,* 379 Mass. 472 (1980). Earlier in his instructions, the judge stated, ''You are not to engage in any guesswork about any unanswered questions . . . or to speculate about what the real facts might or might not have been.'' He also stated, ''You are to decide what the facts are solely from the evidence admitted in this case and not from suspicion or conjecture.'' The defendant argues that the earlier instruction undermined the jury's ability to infer that a proper investigation and further testing would have uncovered evidence supporting her accident theory.

The argument is without merit. The *Bowden* instruction permits jurors to consider evidence (actually presented) of police failure to take certain investigatory steps, as it relates to the reliability of the Commonwealth's case, and indeed evidence of such failures alone may be sufficient to create a reasonable doubt of the defendant's guilt. *Commonwealth* v. *Bowden, supra* at 486. The *Bowden* instruction, however, is not intended to permit jurors to speculate about the results of investigative steps not taken. The instructions correctly convey these two principles.

6. *General Laws c. 278, § 33E.* We have reviewed the entire record pursuant to G. L. c. 278, § 33E. The case was well tried by very able counsel. The question whether the shooting was the product of premeditation or whether there was a reasonable doubt that it was the product of accident was fully and properly before the jury. We do not second guess their resolution of it, and see no basis on which to set aside or reduce their verdict.

*Judgment affirmed.*

*Order denying motion for*
*a new trial affirmed.*