GREEN, C.J.
*120 A group altercation outside a party on Martha's Vineyard led to a complaint charging the defendant with two *121 counts of felony assault and battery.[1] He now appeals from two orders of a District Court judge denying his motions to suppress (1) evidence of an out-of-court identification made by an assault victim, and (2) statements the defendant made to police after suggestions by an officer that his cooperation would avoid a felony charge.[2] We affirm the order denying suppression of the identification. However, we agree with the defendant that the Commonwealth did not meet its burden to prove, beyond reasonable doubt, that the defendant's statements were voluntary, and accordingly we reverse the order denying his motion to suppress them.
Background. We summarize the motion judge's subsidiary findings of fact, which the defendant does not contest.
On June 28, 2014, the victim went to a party in West Tisbury before going to a party in Oak Bluffs. He had three or four beers that evening and it was "possible" he had some cocaine.
When the victim arrived at the Oak Bluffs party he encountered Matt Brown, whose sister the victim had been dating. Believing Brown was going to attack him, the victim struck Brown first and was then attacked by several others who cornered him in a parking lot. The victim was between several cars when he struck Brown, and then the defendant struck the victim in the face twice. The defendant tackled the victim and then sat on his chest while *691 hitting him some more. While the defendant was hitting the victim, a third member of the group, Riley Dobel, came over and began "down-force" kicking and "stomping" the victim in the face and arms.[3] The attackers then ran away and the victim was helped by two others, who drove him to the hospital.
The victim had seen the defendant earlier at the party, and extended congratulations to him for his brother's new child. The victim was also introduced to the defendant's friend Dobel, and talked to him about playing golf with Dobel's father in a "men's league at Farm Neck." The victim saw the defendant and Dobel at other times during the party up until the attack.
*122 The victim knew the defendant as an "island kid," knew his father, knew his older brother, and knew that the defendant lived at his grandmother's house around the corner from the victim's house. As a result, he saw the defendant often; he also periodically saw pictures of the defendant in the newspapers for his athletic accomplishments. The victim had seen the defendant, and Dobel, more than a "hundred times" around town.
At around 2:00 A.M. , on June 28, 2014, Detective James Morse of the Oak Bluffs police department was dispatched to the Martha's Vineyard Hospital to interview the victim, who was hospitalized for treatment following the attack. The victim had suffered multiple facial fractures on both sides of his head. Detective Morse noticed that the victim had a "fractured orbit" and seemed "a little off." Over the course of an interview lasting three or four minutes, the victim told Detective Morse that he had been jumped by Brown and his friends, one of whom was the defendant's brother Marquis Rivers, at a party in Oak Bluffs.
After staying at the hospital for a short time, Detective Morse proceeded to the house in Oak Bluffs where the altercation had occurred. He met the defendant at the house, and asked him what happened. The defendant responded he did not know anything or see anything.
Approximately fourteen hours later, at 4:00 P.M. on June 28, Oak Bluffs police Officer William Johnson reported to the police station for his scheduled shift. Detective Morse spoke with Officer Johnson about his investigation of the assault. Johnson was familiar with a couple of the people allegedly involved, including the defendant, whom Johnson knew from growing up on Martha's Vineyard. Johnson had the defendant's telephone number. Detective Morse directed Johnson to contact the defendant and ask him to come to the police station for an interview.
Morse told Johnson that another individual may have caused the primary harm to the victim; that based on the state of the investigation, the defendant might be charged with a felony; but that it appeared that if the defendant came to the station and told his side of the story, he would be charged with a much lesser crime, such as misdemeanor simple assault. Morse did not, however, instruct Johnson to tell the defendant he would receive a lesser charge if he cooperated.
Johnson telephoned the defendant shortly after his conversation with Morse. Johnson identified himself as an Oak Bluffs police officer, and advised the twenty-six year old defendant that the *123 police were interested in him as an involved party in the case and that it was the police's understanding *692 that he committed a simple assault. Johnson went on to advise the defendant that if he came forward and gave a detailed account, he would be "very highly likely to avoid being charged with a felony."
At around 5:45 P.M. on June 28, 2014, about ninety minutes after Johnson had called him, the defendant called the Oak Bluffs police department and spoke to Detective Morse. The defendant said he had been involved in the fight with the victim. He said that he and Brown had arrived at the house where the assault occurred. The victim came out of the house and "sucker punched" Brown. When asked why he did not say that earlier, the defendant responded that he had been drunk. Morse told the defendant to come to the station for an interview.
At 2:00 P.M. the following afternoon, June 29, the defendant and his father came to the police station and met with Morse. The defendant was given proper Miranda warnings and then interviewed.[4] The defendant's father was present during the interview. The defendant proceeded to give a fuller account of his involvement in the altercation than he gave during the previous night's telephone call to Morse. The interview lasted about twelve minutes. A little more than halfway through the interview, Morse commented to the defendant "I can't promise you're not going to get charged with any of these injuries, but if you did nearly what you did [sic ], it sounds to me like it could be a defense. You were just trying to help your friend who got punched. The problem is ... how it went from your original story to all this."
Seven hours later, at 9:00 P.M. on June 29, the defendant returned to the police station (with no prompting by police in the interim) for another recorded interview, which lasted fewer than ten minutes. The detective asked the defendant to lead him through the fight previously described; this time, the defendant added that Dobel kicked the victim after the defendant called for help. The defendant explained that he yelled for help when the victim was getting the better of him while wrestling on the ground, after the victim sucker punched Brown and the defendant intervened. Morse made no reference to reduced charges during *124 the second interview.[5]
Detective Morse summarized the results of his investigation in a police report describing the attack on the victim.[6]
Detective Morse sought a further meeting with the victim in July, but an attorney representing the victim contacted the detective by letter dated July 18, 2014, in which he directed the police not to contact the victim, but invited the detective to call him. The attorney's office also asked for any police reports on the matter. The detective responded by mail and furnished the police report as requested. The report contained no photographs of any of the individuals named as involved in the attack.
On September 29, 2016, Detective Morse again interviewed the victim at the Oak *693 Bluffs police station. The victim identified his attackers as being the defendant, Brown, and Dobel. The victim told Detective Morse that he had not identified his attackers at the first interview because "he was not in a good place, and had been beaten up." The victim said the reason he had stated that the defendant's brother Marquis had attacked him was because he had "been in school with [Marquis], but he was wrong. It had been his brother, [the defendant] Matt Rivers."
At the end of the interview, the detective decided to conduct a photographic (photo) array procedure to identify the attackers. After uniform pictures were selected of various subjects, the victim was then shown two sequential, double-blind photo arrays of six photographs each.[7] Photographs of the defendant and his brother were in one of the arrays.[8] The victim identified the picture of the defendant as that of one of his attackers.
Identification. "Where an out-of-court eyewitness identification arises from an identification procedure that was conducted by the police, the identification is not admissible under art. 12 of the Massachusetts Declaration of Rights if the defendant proves by a preponderance of the evidence that the identification was 'so unnecessarily suggestive and conducive to irreparable misidentification *125 that its admission would deprive the defendant of his right to due process.' " Commonwealth v. Johnson, 473 Mass. 594, 596-597, 45 N.E.3d 83 (2016), quoting from Commonwealth v. Walker, 460 Mass. 590, 599, 953 N.E.2d 195 (2011). In such circumstances, "we review a judge's findings of fact to determine whether they are clearly erroneous but review without deference the judge's application of the law to the facts as found." Johnson, supra at 602, 45 N.E.3d 83.
The defendant contends that the identification procedure employed by the police was impermissibly and unnecessarily suggestive, because the victim saw a police report naming the defendant as one of his assailants before the victim identified the defendant in the photo array.[9] The argument is fundamentally flawed. First, the victim's ability to recognize the defendant's picture in the photo array was not influenced by the report; indeed, the victim was very familiar with the defendant before the attack. Moreover, the police report cited by the defendant as the source of the alleged suggestiveness did not include an image of the defendant, and therefore could not have been the source of the victim's ability to recognize the defendant's photograph as an image of the defendant.
The defendant's claim amounts, in substance, to a contention that the victim's assertion that the defendant was among his assailants was a product of the victim's review of a police report naming the defendant among the alleged assailants. As such, the claim is not that the report influenced the victim's ability to spot the defendant's picture in the array of possible attackers, but that it influenced his memory of who had attacked him. In the circumstances, the motion judge did not err in concluding that the possibility of such influence did not make the procedure "so unnecessarily suggestive and conducive to *694 irreparable misidentification that its admission would deprive the defendant of his right to due process." Johnson, supra at 597, 45 N.E.3d 83. The matter is an appropriate topic for cross-examination at trial, and ultimately goes to the weight of the victim's testimony, not its admissibility. The motion to suppress the identification was properly denied.
Voluntariness of statements. The defendant asserts that his statements to police were involuntary because they were products of improper police-initiated promises of leniency and assurances that his statements would aid in his defense. "It is well established *126 that a confession or an admission is admissible in evidence only if it is made voluntarily." Commonwealth v. Tremblay, 460 Mass. 199, 206, 950 N.E.2d 421 (2011). "The test for voluntariness of a defendant's statement is 'whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act.' " Commonwealth v. McCowen, 458 Mass. 461, 471, 939 N.E.2d 735 (2010), quoting from Commonwealth v. Selby, 420 Mass. 656, 663, 651 N.E.2d 843 (1995). "Factors relevant to the totality of the circumstances include whether promises or other inducements were made to the defendant by the police, as well as the defendant's age, education, and intelligence; experience with the criminal justice system; and his physical and mental condition, including whether the defendant was under the influence of drugs or alcohol." Commonwealth v. Durand, 457 Mass. 574, 596, 931 N.E.2d 950 (2010), S.C., 475 Mass. 657, 59 N.E.3d 1152 (2016), cert. denied, --- U.S. ----, 138 S.Ct. 259, 199 L.Ed.2d 167 (2017). "The Commonwealth bears the burden of proving, beyond a reasonable doubt, that the defendant's statements were made voluntarily." Ibid. "[W]e 'give[ ] substantial deference to the judge's ultimate findings and conclusions of law, but independently review the correctness of the judge's application of constitutional principles to the facts found.' " Commonwealth v. Tolan, 453 Mass. 634, 641-642, 904 N.E.2d 397 (2009), quoting from Commonwealth v. LeBeau, 451 Mass. 244, 254, 884 N.E.2d 956 (2008).
Regarding "whether ... implied promises of leniency were likely to have affected the voluntariness of the defendant's statements, the 'touchstone is whether the police "assured" the defendant that [his] confession would aid [his] defense or result in a lesser sentence.' " Tolan, supra at 642-643, 904 N.E.2d 397, quoting from Commonwealth v. Jordan, 439 Mass. 47, 53, 785 N.E.2d 368 (2003). For permissible forms of encouragement by police, see Commonwealth v. Meehan, 377 Mass. 552, 564, 387 N.E.2d 527 (1979), cert. dismissed, 445 U.S. 39, 100 S.Ct. 1092, 63 L.Ed.2d 185 (1980) : "An officer may suggest broadly that it would be 'better' for a suspect to tell the truth, may indicate that the person's cooperation would be brought to the attention of the public officials or others involved, or may state in general terms that cooperation has been considered favorably by the courts in the past" (footnotes omitted).
In the present case, we are persuaded that Officer Johnson's conversation with the defendant-including telling him that coming forward would make him "very highly likely to avoid being charged with a felony"-amounted to a prohibited assurance *127 that it would aid his defense or lessen his sentence if he cooperated with police. See id. at 564-565, 387 N.E.2d 527 (improper assurance included officer's statements to defendant that confession would "probably help your defense; in fact, I am sure it would" and that "the truth is going to be a good defense in this particular *695 case"). Contrast Commonwealth v. DiGiambattista, 83 Mass. App. Ct. 180, 187-188, 982 N.E.2d 45 (2013) (officer made clear he was not making specific promises of leniency). The defendant's relatively young age, and his lack of any prior involvement with the criminal justice system, also weigh in our assessment of voluntariness, as well as the fact that Johnson had a prior personal acquaintance with the defendant.[10] It is immaterial that Detective Morse did not instruct, or even authorize, Johnson to promise leniency in exchange for the defendant's cooperation; the fact remains that Johnson's assurance was a powerful inducement for the defendant to come to the station to give a statement.[11] We also observe that Detective Morse ended the first interview by observing that, while the defendant's confession was helpful, it "would behoove" him to identify any other individuals he knew to have been involved.
On the other hand, we are cognizant of factors that support a conclusion of voluntariness. The judge found that the interviews with Detective Morse were not aggressive or coercive in nature. He also found that the defendant was clear and articulate in the interviews, appeared well oriented as to time and place, and showed a full understanding of the process taking place.
It is the totality of the circumstances that we must consider, however. On balance, especially where the defendant's statements were preceded by an enticing assurance of leniency, we conclude that the Commonwealth did not meet its burden to prove beyond a reasonable doubt that he made his statements voluntarily. The motion judge erred in denying the motion to suppress.
Conclusion. The order denying the defendant's motion to suppress the victim's out-of-court identification of the defendant is *128 affirmed. The order denying the defendant's motion to suppress his statements to police is reversed.
So ordered.

Aggravated assault and battery, G. L. c. 265, § 13A(b ), and assault and battery by means of a dangerous weapon (shod foot), G. L. c. 265, § 15A(b).

Single justices of the Supreme Judicial Court allowed the defendant's motions to take an interlocutory appeal from each order. See Mass.R.Crim.P. 15(a)(2), as appearing in 474 Mass. 1501 (2016). We treat the appeals together.

Dobel was also criminally charged and, like the defendant, Dobel unsuccessfully moved to suppress his identification by the victim. We declined to consolidate his appeal with the defendant's, but we decide his appeal today in a decision under our rule 1:28 that is consistent with this opinion.

The police made an audiovisual recording of the Miranda warnings and the interview.

The judge also found that at one point during the interview that was not audible on the recording, Morse warned the defendant that he could be charged with a felony if he misled the police.

The report states in part that the defendant told the detective that the victim had "sucker punched" Brown; the defendant then struck the victim twice and they ended up on the ground with the victim getting the better of him. The defendant said he saw Dobel kick the victim while he was on the ground.

The photo identification procedure was administered by a Tisbury police department detective who was not otherwise involved in the case.

The other array included a picture of Dobel.

The defendant relies on the fact that in his initial statement to police, the victim did not name the defendant as one of his attackers, but instead named the defendant's brother Marquis.

Though there is no suggestion that Officer Johnson and the defendant were close friends, the record makes plain that Detective Morse chose Johnson to contact the defendant based at least in part on the fact that the two had grown up together on the island.

We similarly place little significance on the Commonwealth's observation that Detective Morse did not repeat Officer Johnson's assurance when the defendant appeared at the police station the following day for the purpose of answering questions.